JUDE G. GRAVOIS, Judge.
 

 [aThis appeal concerns the interpretation of a Settlement Agreement between the parties, the Kenner Fire Fighters Association Local No. 1427 I.A.F.F (plaintiff) and the City of Kenner (defendant). At issue is the trial court’s judgment of August 29, 2008, which found that Harold West, a fire communications officer employed by the Kenner Fire Department, was included within the class of employees to which the Settlement Agreement applied, and therefore was entitled to the pay raises given that class. The City of Kenner appeals that judgment, arguing that the trial court erred in finding that the parties intended fire communications officers to be included in the Settlement Agreement. For the reasons that follow, we reverse the judgment of the trial court and render judgment in favor of the defendant.
 

 Procedural History
 

 The Settlement Agreement arose out of two class action lawsuits filed by the Ken-ner Fire Fighters Association against the City of Kenner. The first suit, filed in L1994,
 
 [1]
 
 alleged that the City misapplied the provisions of LSA-R.S. 33:1996 and R.S. 33:1999 relative to the calculation of vacation and holiday pay for fire fighters and certain employees of the Kenner Fire Department who worked 24/48 hour on/off shifts. The second suit, filed in 2000,
 
 [2]
 
 concerned when fire fighters could use their paid vacation days. After many years of litigation, a Settlement Agreement was reached and was approved by the trial court in March of 2002. The Order of Dismissal, dated March 20, 2002,
 
 *149
 
 specifically reserved to the parties the right to re-open the matter for good cause shown in the event of noncompliance with the terms of the Settlement Agreement.
 

 On October 28, 2008, a Motion to Reopen for Enforcement of Settlement Agreement was filed by plaintiff on behalf of Harold West. The Motion alleged that Mr. West was employed by the Kenner Fire Department as a “fire dispatcher,” and that the City of Kenner had refused to pay Mr. West any of the pay increases provided in the Settlement Agreement on the grounds that Mr. West was not a “fire fighter” and therefore was not a member of any of the subclasses defined by the Settlement Agreement.
 
 [3]
 
 The City of Ken-ner opposed the Motion.
 

 On March 22, 2004, the trial court rendered a judgment ordering that the matter be reopened for consideration of the plaintiffs claims. On December 27, 2007, plaintiff filed a Motion to Enforce Settlement. The City of Kenner filed an Ex Parte Motion for Dismissal on the Ground of Abandonment, which the trial court granted on January 28, 2008. The plaintiff then filed a Motion to Set Aside Order of Dismissal. The parties ultimately agreed to recall the January 28, 2008 border that granted the dismissal, and set the Motion to Enforce Settlement for an evidentiary hearing, which was held on July 29, 2008.
 

 At the hearing, after the parties presented testimony and evidence, the trial court ruled in favor of plaintiff, finding that the parties intended fire communications officers to be included in Subclass 3 of the Settlement Agreement. The judgment specifically reserved to further proceedings all matters relating to a quantum award. The City of Kenner filed this appeal.
 

 Analysis
 

 The Settlement Agreement in this matter is a compromise. A compromise is a written contract. The compromise instrument is the law between the parties and must be interpreted according to the parties’ true intent. The compromise instrument is governed by the same general rules of construction applicable to contracts.
 
 Hudson v. Progressive Sec. Ins. Co.,
 
 43,857 (La.App. 2 Cir. 12/10/08), 1 So.3d 627, 631-632, writ denied 09-0235 (La.3/27/09), 5 So.3d 148.
 

 This Court, in
 
 Kappa Loyal L.L.C. v. Plaisance Dragline & Dredging Co., Inc.,
 
 03-124, pp. 6-7 (La.App. 5 Cir. 6/19/03), 848 So.2d 765, 769, has summed up the law on contract interpretation as follows:
 

 We are obligated to give legal effect to contracts according to the true intent of the parties. LSA-C.C. art. 2045. The true intent of the parties to a contract is to be determined by the words of the contract when they are clear, explicit, and lead to no absurd consequences. LSA-C.C. art. 2046. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. LSA-C.C. art. 2046. In such cases, the meaning and intent of the parties to the written contract must be sought within the four corners of the instrument and cannot be explained or contradicted by parol evidence. LSA-C.C. art. 1848. Contracts, subject to interpretation from
 
 *150
 
 the instrument’s four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after an examination of the four corners of the agreement. In cases in which |sthe contract is ambiguous, the agreement shall be construed according to the intent of the parties. Intent is an issue of fact which is to be inferred from all of the surrounding circumstances. A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties. LSA-C.C. art. 2053. Whether a contract is ambiguous or not is a question of law. Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown.
 

 A contract is ambiguous when it lacks a provision bearing on the issue, its written terms are susceptible to more than one interpretation, there is uncertainty as to its provisions, or the parties’ intent cannot be ascertained from the language used.
 
 Campbell v. Melton,
 
 01-2578 (La.5/14/02), 817 So.2d 69.
 

 Contractual words are given their generally prevailing meaning unless the words have acquired a technical meaning. LSA-C.C. arts. 2045, 2047. Words of art and technical terms must be given them technical meaning when the contract involves a technical matter. LSA-C.C. art. 2047;
 
 Schroeder v. Board of Supervisors,
 
 591 So.2d 342, 345 (La.1991). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the intent of the parties. LSA-C.C. art. 2046.
 

 Parol or extrinsic evidence is generally inadmissible to vary the terms of a written contract unless the written expression of the common intention of the parties is ambiguous.
 
 Ortego v. State, Through the Dep’t of Trans. & Develop.,
 
 96-1322 (La.2/25/97), 689 So.2d 1358.
 

 The plaintiff argued that Mr. West should have received the pay raises because he was included in Subclass 3, Group A, of the Settlement Agreement. Plaintiff noted that Mr. West was an employee of the Fire Department,
 
 [4]
 
 participated in the fire fighters’ retirement system, and was a member of the fire | (¡fighters’ union. Plaintiff argued that the Settlement Agreement contained provisions resolving other differences between the parties, not only those addressed in the two class action suits, and therefore Mr. West could receive the pay raises, even though he was not a member of the class action lawsuit. Plaintiff argued that had the defendant meant only “fire suppression personnel” to be covered by the Agreement, it should have been more specific.
 

 The court focused on the definition of “fire fighter” as used in the Settlement Agreement. Defendant argued that in the Settlement Agreement, the term “fire fighter” was a term of art meant to be more specific than “fireman” and meant only those personnel actively engaged in fire suppression activities. Mr. West, as a fire communications officer, was not so engaged. Defendant argued that the lawsuits were filed to address issues specific to how the city paid and allocated vacation time for fire fighters who worked 24/48 hour shifts. Fire dispatchers (fire communications officers) were not included in the lawsuits or the settlement, defense counsel
 
 *151
 
 argued, because they worked 8 hour shifts and thus they had not been affected by the City’s interpretation of the statutes governing how their vacation was paid and/or allocated.
 

 The City submitted twenty exhibits in support of its position that fire communications officers were not included in the Settlement Agreement. The first three exhibits were introduced to support the City’s contention that the parties’ definition of “fire fighter” throughout the litigation and as used in the Settlement Agreement was limited to those fire suppression personnel who worked 24/48 hour shifts.
 
 [5]
 
 Defense counsel argued that these exhibits showed that the term “fire fighter” had a relevant history and context for the parties throughout this litigation.
 

 |7D-4 was a copy of this Court’s 1999 opinion in the suit. D-5 was a rule to determine the quantum for the members of the classes, both of which defendant argued showed that the parties used the term “fire fighter” to refer only to fire suppression personnel.
 

 D-6, D-7, and D-8 were communications between counsel for plaintiff and defendant in 2000 as they negotiated the Settlement Agreement. Defense argued that these letters showed that the parties’ efforts were focused on fashioning a settlement agreement for the employees who had lost vacation time (i.e. the fire suppression personnel who worked 24/48 hour shifts), not the other employees of the fire department whose vacation pay was not in dispute.
 

 D-9 was a letter to the Mayor of Ken-ner from Rebowe & Company, a CPA firm that the City engaged to calculate the City’s potential liability under the settlement to the affected employees. The letter specifically stated that the analysis included only fire fighters in the City’s employment during the years 1990 through 1999. “Employees in the Administrative and Communications Divisions of the Kenner Fire Department were not included in the analysis.” D-9. Attached to this letter was a copy of the summary schedule listing each employee and the potential unpaid annual leave and associated judicial interest in total and for each year analyzed.
 

 Defense counsel argued that the settlement had two components: a lump-sum payout for those fire fighters who had left the Fire Department’s employment; and a prospective pay raise, in lieu of a lump-sum payout, to those fire fighters who were owed back vacation pay but were still currently employed by the department. He said that since the department also wanted to hire new fire fighters (which is addressed in the Additional Terms section of the Settlement Agreement), the newly hired fire fighters were also brought in at the same scale. He stated that|sthe intent was never to give these raises, which were compensation for back pay liability to past and present fire fighters and were to give equality of scale to newly hired fire fighters, to employees who had never suffered the loss of vacation pay, like fire communications officers.
 

 D-10, D-ll, D-12, and D-13 were lists used by the parties to determine what retired/separated employees were due lump-sum payouts and how much. Defense counsel noted that William Baradell, a retired fire communications officer who appeared on the first list (D-10), as well as several other retired fire communications officers, were deleted from the final list
 
 *152
 
 because they were owed no back pay. In other words, defense counsel argued, retired fire communications officers were not included in Subclasses 1 or 2 and received no lump-sum payout or other award under the Settlement Agreement, unlike retired/separated fire suppression personnel, who did receive lump sum payments under the Settlement Agreement.
 

 D-14 was correspondence from plaintiffs counsel with the notice to the class about the Settlement Agreement. The document stated that the settlement had been reached after considering the risks and benefits to the “class,” which, defense counsel pointed out, never included fire communications officers.
 

 D-15 was the Settlement Agreement itself. Defendant argued that a clear reading of that document showed that the definitions of each subclass were interdependent and interrelated. The subclass to which Mr. West claimed to belong, Subclass 3, was defined in relation to Subclasses 1 and 2. It was defined as all fire fighters employed on or after March 26, 1991 and on or before December 31, 2001 who did not meet the criteria for membership in Subclass 1 and who did not meet the criteria for membership in Subclass 2. Subclass 1 was defined as all fire fighters employed on or after March 26, 1991 and who separated from [ ^employment prior to June 30, 2001. Subclass 2 was defined as all fire fighters eligible for retirement on or before June 30, 2006 who had already retired or passed away or who would retire or pass away anytime after June 30, 2001 and on or before June 30, 2006.
 

 Defendant pointed out that the members of Subclasses 1 and 2 are listed by name in the Settlement Agreement. Defense counsel stated that no Subclass 1 member listed by name was a retired or separated fire communications officer, though employment lists used in confecting the Settlement Agreement had identified several (such as William Baradell) who ultimately were not included in the Settlement Agreement. Retired or separated fire communications officers were not included in Subclass 1, defendant argued, because they were not class members of either lawsuit and thus were not owed a lump-sum payout.
 

 Defendant noted that Mr. West had brought his initial claim to the Civil Service Board, which rejected his claim on August 19, 2002.
 
 [6]
 
 The minutes of that meeting were introduced as D-16. Defense counsel noted that one of the four members of the board who voted to reject Mr. West’s claim, Mike Voltolina, was the Fire Union’s representative on the Civil Service Board, who was personally familiar with the class action lawsuit and the Settlement Agreement.
 

 The City introduced D-17, a printout of a portion of the City’s website that advertised positions for hire, for the purpose of showing that the City advertised “fire fighter” and “fire communications officer” as completely different classifications, which, he argued, bolstered his position that “fire fighter” as used by the parties in the Settlement Agreement meant only fire suppression personnel.
 

 D-18 was a letter dated July 24, 2008 from the City of Kenner Personnel Director to defense counsel, to which was attached two print outs from City of 1 mKenner personnel databases with employment data (dates of hire and separation, job title) on Mr. West as well as several other employees.
 

 
 *153
 
 Exhibits D-19 and D-20 in globo list the job classifications and descriptions for fire communications officer, fire fighter, fire driver, fire captain, district fire chief, assistant fire chief, and fire chief. These exhibits showed that the parties’ definition of "fire fighter” did not include fire communications officers, defense counsel argued.
 

 Defense counsel noted that LSA-R.S. 33:1991’s definition of “fireman” included operators of the fire-alarm system when such operators are members of the regularly constituted fire department. He argued, however, that under the statutes, all fire fighters are firemen, but not all firemen are fire fighters.
 

 Plaintiff submitted the testimony of Mr. Joseph Sunseri, who at the time of his testimony had been employed by the Ken-ner Fire Department for over nineteen years, and was an Operator (a “fire fighter”) in the spring of 2002 when the Settlement Agreement was finalized. He was also President of the Association of the Kenner Fire Fighters Union. He testified that Union membership included fire dispatchers and fire alarm operators.
 

 Mr. Sunseri testified that he participated in discussions with then Kenner Mayor Congemi regarding the settlement of this lawsuit. He testified that it was his understanding that fire alarm officers would be included in the pay raises. He said that the purpose of including individuals in the settlement who did not have a vacation pay claim was the city’s proposal to, in general, give the fire department a raise over the next five years. It was his understanding that the mayor wanted to give a pay raise to the entire fire department. His understanding was that “the mayor was proposing a raise instead of paying us what he owed us.” He said that | uthe mayor expressed to him a desire to implement these system-wide pay raises as an effort to improve morale and efficiency within the department.
 

 On cross examination, Mr. Sunseri agreed that Mr. West was not a member of the class who filed the lawsuit. He agreed that he had read the Settlement Agreement and was familiar with it. He admitted knowing that there were fire communications officers who had left service with the City of Kenner before June 30, 2001, and that none of these people were listed in Subclass 1 for a lump sum payout, nor did he see the name of any fire communication officers in Subclass 1 or Subclass 2. He agreed that they were not included because they were owed no money. He stated that they were not owed money because they weren’t affected by the vacation policy the city was using. He claimed that there were “a lot of people” in Subclass 3 that weren’t owed anything and got money, but he did not elaborate about who these people were or what positions they held.
 

 Mr. Sunseri testified that neither secretaries or records clerks got raises, yet they were employed by the fire department. This testimony is at odds with his earlier assertion that it was his understanding that the mayor was giving the raises to the “entire” fire department, a position he reiterated on redirect.
 

 Mr. Sunseri agreed that the term “fireman” would include a fire alarm operator or a dispatcher. It was his opinion that the word “fire fighter” also included prevention officers, inspectors, communications officers, secretaries, and records clerks. He was of the opinion that it was the intent of the Settlement Agreement to include these employees as well.
 

 Mr. Sunseri testified that he knew who Mike Voltolina was, and that he was at one time the representative for the fire fighters on the Kenner Civil Service Board.
 
 *154
 
 He did not discuss Mr. Voltolina’s vote with him, however, nor did he know why he voted to reject Mr. West’s claim. He agreed that Mr. Voltolina was 112elected by the Fire Department Union and non-union alike to represent them on the Civil Service Board.
 

 Mr. Sunseri testified that it was his impression that over the years, there were times that the fire communications officers got whatever pay raises the fire suppression personnel got, and there were other times when they were given the pay raises that the City of Kenner employees got. He did not explain what years he meant or the basis for his impression.
 

 On redirect, Mr. Sunseri testified regarding a memo from Mayor Congemi to the Kenner City Council members, dated September 26, 2001, regarding the settlement. Therein, the Mayor states that “we have agreed upon a plan which will not only settle the pending lawsuit, but also improve the morale and efficiency within the Department.” Sunseri testified that in his conversations with the Mayor, they discussed matters “outside the lawsuit” and those matters included pay raises for “everybody in the department,” not just people who were affected by the vacation pay. Plaintiffs counsel also noted that the memo highlighted the union’s vote to approve the “plan,” and that the union included fire dispatchers.
 

 At the hearing, following all of the evidence and testimony, the trial court ruled from the bench. The court stated that if the document were ambiguous, “... then I’ve got to give it its broadest possible interpretation.” This standard, however, is not correct. The law is clear that the court’s duty in every contract interpretation case is to divine the intent of the parties to the contract, not make the broadest interpretation of an ambiguous contract. When the parties’ intent is readily discoverable within the four corners of the contract, the court’s exercise ceases. When it is not, an ambiguous provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the | formation of the contract, and other contracts of a like nature between the same parties.
 
 Kappa Loyal L.L.C. v. Plaisance Dragline & Dredging Co., Inc., supra.
 

 The trial court concluded that the Settlement Agreement clearly addressed additional issues than those raised in the two class action lawsuits, and thus said it would not place much weight on argument by the defense that the parties did not intend the settlement to cover fee communications officers. The trial court found that the Settlement Agreement was ambiguous in that it did not define the term “fire fighter.” The trial court turned to several Revised Statutes to define “fire fighter.”
 

 After thoroughly considering the evidence presented and the applicable law, we find that the trial court erred in its conclusion that currently-employed fire communications officers were included in Subclass 3 when evidence clearly showed that retired/separated fire communications officers were not included in Subclasses 1 or 2. Likewise, the trial court erred when it turned to the Revised Statutes to determine what the parties meant by “fire fighter” in the Settlement Agreement, when there was no evidence presented that the parties themselves used those statutory definitions to define “fire fighter” throughout the litigation or in the Settlement Agreement itself.
 
 [7]
 
 On the contrary, the defense presented much documentary evi
 
 *155
 
 dence, as outlined above, showing that the parties defined “fire fighter” through the course of the litigation as fire suppression personnel who worked 24/48 hour shifts. The court erred in giving little weight to the defense’s evidence that clearly showed the “usages and conduct” of the parties.
 

 After deciding specific settlement terms for each Subclass, the Settlement Agreement contains a final section entitled “Additional Terms and Settlement Consideration,” which listed nine specific provisions. We agree that the 114Settlement Agreement’s section entitled “Additional Terms and Settlement Consideration” is unambiguous proof that the parties intended to resolve those specific additional issues that are enumerated therein, such as the hiring of new fire suppression personnel. The lack of ambiguity there, however, does not lead to the conclusion that the parties intended currently employed “fire communications officers” to be included in Subclass 3 when, as the evidence established, retired/separated fire communications officers were not included in Subclasses 1 or 2.
 

 The trial court also erred in crediting the memo by the Mayor to the Council and Mr. Sunseri’s testimony about it. The memo was dated September 21, 2001, six months before the “plan” was finalized into the Settlement Agreement. The Mayor’s description of the “plan” in the memo differed in several respects from the final Settlement Agreement.
 
 [8]
 
 Mr. Sunseri was asked only about the Mayor’s statement that the “plan” would increase the morale of the department. He interpreted that to mean the “entire department” would get raises under the settlement, yet earlier in his testimony acknowledged that secretaries and records clerks employed by the fire department did not receive the raises. We find that the mayor’s statement that the plan would “improve morale and increase efficiency” in the department is broad and non-specific, and does not support a conclusion that the plan intended to include raises to employees who had not lost vacation pay.
 

 Conclusion
 

 In conclusion, the trial court erred in ruling in favor of the plaintiff when the evidence presented by the defendant clearly established that the Settlement 1! ¡Agreement did not intend to include awards, either by lump sum or prospective pay raises, to fire communications officers such as Harold West. Accordingly, the trial court’s judgment in favor of plaintiff is reversed. Judgment is hereby rendered in favor of the City of Kenner, dismissing the plaintiffs claims.
 

 REVERSED AND RENDERED.
 

 [1]
 

 .
 
 Kenner Firefighters Association Local No. 1427, I.A.F.F., Brian Hughes and a Class of Similarly Situated Employees of the Kenner Fire Department v. The City of Kenner,
 
 96-361 (La.App. 5 Cir. 11/14/96), 685 So.2d 265; 99-186 (La.App. 5 Cir. 8/31/99), 742 So.2d 989, writ denied 99-2697 (La. 11/24/99), 750 So.2d 993.
 

 [2]
 

 .
 
 Kenner Firefighters Association Local No. 1427, I.A.F.F., Frank Mannino and a Class of Similarly Situated Employees of the Kenner Fire Department v. The City of Kenner,
 
 551-551 (24th Judicial District Court, Parish of Jefferson).
 

 [3]
 

 . The Settlement Agreement provided that to settle the dispute, certain subclasses would receive lump sum compensation for lost vacation time, because they had already left employment or retired, and certain other subclasses, because they remained employed, would receive prospective pay raises. Mr. West did not claim that he was owed any compensation for lost vacation pay; this suit concerns his right to prospective pay raises only.
 

 [4]
 

 . The record shows Mr. West was hired by the Fire Department in 1988.
 

 [5]
 

 . The three exhibits, D-l, D-2, and D-3, were the class action petition in the Brian Hughes suit, the plaintiff's pre-trial memorandum in the same case, and the parties’ joint stipulations of fact in the same case.
 

 [6]
 

 . From the minutes of this meeting, it appears that 4 of the 5 Board members were present. All four members present voted to reject Mr. West’s claim.
 

 [7]
 

 . LSA-R.S. 11:2252, 17:1682, and 33:1991.
 

 [8]
 

 . For instance, the Mayor's memo said that five new fire fighters would be hired under the plan, but the Settlement Agreement stated that six would be hired. In item 3, the memo also states what new hires will be paid; the Settlement Agreement does not provide the salaries of new hires,