# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 13-30294,
consolidated with Nos. 13-30721 & 13-30748

United States Court of Appeals
Fifth Circuit

**FILED**

December 8, 2014

Lyle W. Cayce
Clerk

Nos. 13-30294 & 13-30721

SUNDOWN ENERGY, L.P.,

Plaintiff-Appellant,

v.

STEVEN G. HALLER; FLASH GAS & OIL SOUTHWEST,
INCORPORATED,

Defendants-Appellees.

Consolidated with No. 13-30748

SUNDOWN ENERGY, L.P.,

Plaintiff-Appellee,

v.

STEVEN G. HALLER; FLASH GAS & OIL SOUTHWEST,
INCORPORATED,

Defendants-Appellants.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before STEWART, Chief Judge, and DENNIS and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

This consolidated appeal arises from a dispute between Steven G. Haller and Flash Gas & Oil Southwest, Inc. (collectively, "Defendants") and Sundown Energy LP ("Sundown") regarding the terms of a settlement agreement. Sundown sued Defendants in state and federal court, seeking a partition of land they co-owned, return of rental payments, and a right of way over Haller's property. On the day trial was set to begin in federal court, the parties agreed to a settlement. Because the parties had not yet agreed on a written draft of the settlement, the agreement was read into the record before the district court. However, subsequently, the parties were unable to agree on the terms of the settlement. In the first appeal, No. 13-30294, Sundown challenges the district court's interpretation of the settlement agreement. In the second appeal, No. 13-30721, Sundown contests the district court's enforcement of the settlement. Lastly, in No. 13-30748, Defendants appeal the district court's denial of their motion for contempt. For the reasons stated herein, we REVERSE in part and AFFIRM in part.

## I.

Sundown owns an oil and gas production facility in Plaquemines Parish, Louisiana. Although Sundown could access its facility via the Mississippi River, it did not have a viable land route. Sundown thus sought permission from landowners with property between its facility and the nearest public highway—Louisiana Highway 39—to cross their property.[1] Haller owns one of the tracts of land between Sundown's facility and Highway 39 ("Haller Tract"). Located on the Haller Tract is a camp used by Haller and his guests for hunting and fishing. Levee Leisure, Inc. ("Levee Leisure"), a company Haller owns, possesses a surface lease on a contiguous tract of land. Flash Gas & Oil Southwest, Inc. ("Flash Gas"), another company owned by Haller, leased

---

[1] Another highway is technically closer; however, it does not present a feasible option for a land route.

No. 13-30294 cons. w/ 13-30721 & 13-30748

the Haller Tract from Haller and the surface lease from Levee Leisure. Unlike the majority of the landowners Sundown contacted, Haller refused to grant Sundown permission to cross his property.[2]

In 2006, Sundown entered into a lease ("Flash Lease") with Flash Gas for the use of a dock facility and canal access on land allegedly owned by Defendants. The lease also permitted Sundown to use a road on the Haller Tract to reach the dock and its facility. In 2010, Haller refused to renew the Flash Lease.

## II.

Once it became apparent that Sundown would be unable to reach an agreement with Haller, Sundown filed suit against Haller in federal court, requesting a right of passage over the Haller Tract and return of the rental payments it made to Flash Gas pursuant to the Flash Lease.[3] Sundown claimed that its facility was an "enclosed estate" under Louisiana Civil Code article 689 and thus entitled to a right of passage. Sundown also filed suit in state court, seeking a partition by licitation of land co-owned by Haller and Sundown.

In federal court, Defendants filed a motion to dismiss Sundown's suit, which the district court denied, and Sundown filed a motion for summary judgment, which the district court granted in part. The court found that Sundown's facility was an enclosed estate but that there were genuine issues of material facts precluding summary judgment on, *inter alia*, the location of the right of way for Sundown. Defendants later filed a motion for summary judgment regarding Sundown's claim for return of rental payments. The

---

[2] Initially, one other landowner refused to permit Sundown to cross; however; that landowner agreed to a settlement with Sundown.

[3] Sundown alleges that it discovered that neither Flash Gas nor Haller owned the property subject to the Flash Lease.

3

district court granted the motion, holding that Sundown could not recover its rental payments because it had undisturbed possession of the land. Before a trial was held, however, the parties agreed to a settlement resolving both the federal suit and state suit.

The parties read the terms of the settlement agreement to the district court. They agreed on the location for the route Sundown would use to access its facility. Sundown was entitled to use this route regardless of which party owned the land in dispute. Sundown was also granted a temporary right of way by Haller to access the dock. In addition, Sundown would obtain bids for the cost of building the road to its facility.[4] Moreover, Haller agreed to not object to Sundown's acquisition of any permits or approvals necessary for construction. The parties also agreed to participate in an auction for "the other's co-ownership interest in Tracts 1 and 2 with the high bidder paying its bid price to purchase the other's interest in both tracts." If Sundown had the winning bid, it would grant a ninety-nine year recreational lease to Haller. The parties agreed to dismiss the federal and state suits and pay their respective costs. The parties' attempts to formulate a written contract memorializing the terms of their agreement were unsuccessful. Subsequently, both parties filed cross-motions for enforcement of the settlement agreement, urging the district court to adopt their respective interpretations of the settlement.

The district court therefore interpreted the provisions of the settlement read into the record and filled in the gaps necessary for enforcement of the settlement. Because the settlement agreement did not specify how the auction proceeds were to be disbursed, the district court held that the magistrate judge

---

[4] Depending on the route and cost of building the road, Haller would pay Sundown a portion of the cost.

No. 13-30294 cons. w/ 13-30721 & 13-30748

("MJ") would have discretion to resolve that issue. However, the court noted its preference that the MJ use the approach advocated by Haller if the parties did not dispute their respective ownership interests—that is, the winning bidder would pay the portion of the bid corresponding to the party's ownership interest in the auctioned property. As for the duration of the right of way, the court noted that the agreement described it as temporary and thus imposed what it considered to be a reasonable period of time—nine months.[5]

The district court also held that, if it was the losing bidder, Sundown would no longer be entitled to use the dock facility. The court was persuaded by "the absence of any provisions in the settlement agreement addressing Sundown's lease of the dock in the event it is not the high bidder."[6] In addition, the court held that Haller was entitled to hunt and "store fuel on the property subject to the recreational lease." After noting that recreational leases in Louisiana usually permit lessors "to lease the property for oil, gas, and mineral exploration," the court held that Sundown had that right subject to the following conditions: 1) it must try to use directional drilling; 2) if directional drilling is not feasible, then the parties must submit to arbitration; and 3) Sundown must give Haller notice when it desires to use the property for mineral, gas, or oil exploration purposes. Additionally, the court held that Haller must pay his portion of the construction costs within ten days of receiving a bill for the construction from Sundown.

The district court then instructed the MJ to conduct the auction.[7] The MJ conducted the auction, and Haller submitted the highest bid—$1.5 million. Thereafter, the district court, adopting the MJ's recommendation, ordered

---

[5] The court noted, however, that this time could be changed if Sundown experienced construction delays that were beyond its control.

[6] Conversely, the settlement agreement stated that Sundown would have access to the dock facility if it was the high bidder.

[7] Sundown appealed this ruling, but the appeal was dismissed as premature.

No. 13-30294 cons. w/ 13-30721 & 13-30748

Sundown to sell its ownership interest in the auctioned land to Haller. Sundown timely appealed.

After the district court approved the auction, Sundown refused to consummate the sale of the auctioned land. Defendants proceeded to file a motion for enforcement of judgment, which the district court granted. Sundown timely appealed the court's judgment. In its order enforcing the parties' settlement agreement, the district court held, *inter alia*, that "if the platform, lights, and other structures are incorporated into the tract of land, i.e., attached to the property by any means, th[e]n those items are component parts of the land and therefore immovable and are not subject to removal, except by the owner of the property."

Meanwhile, Sundown removed the loading platform located on the auctioned land. Defendants filed a motion for contempt, alleging that Sundown was not entitled to remove the platform. After holding an evidentiary hearing, the district court denied the motion. The district court reasoned that the platform constituted movable property, Sundown retained title to the platform, and the Flash Lease was invalid. Defendants timely appealed.

We will first address Sundown's appeal of the district court's interpretation of the settlement agreement and then proceed to the district court's enforcement of the settlement agreement. Lastly, we will turn to Defendants' appeal of the district court's denial of their motion for contempt.

## III.

### A.

"Although federal courts possess the inherent power to enforce agreements entered into in settlement of litigation, the construction and enforcement of settlement agreements is governed by the principles of state law applicable to contracts generally." *E. Energy, Inc. v. Unico Oil & Gas, Inc.*,

6

861 F.2d 1379, 1380 (5th Cir. 1988) (citations and internal quotation marks omitted). We therefore apply Louisiana law to interpret the settlement agreement.

The parties dispute the proper standard of review. Sundown argues that the de novo standard applies because settlement agreements are interpreted like contracts and Louisiana law considers issues of contract interpretation and any corresponding ambiguity to be questions of law. Sundown acknowledges that the clear error standard would apply if the district court found the settlement agreement to be ambiguous but argues that the clear error standard is inapplicable because there is no ambiguity. Conversely, Defendants argue that the manifest error standard applies because the district court's decision concerned the validity and extent of the parties' settlement agreement. The manifest error standard is also applicable, Defendants contend, because the settlement agreement was ambiguous.

"Of course, we, not the parties, determine our standard of review." *See United States v. Clark*, 89 F. App'x 453, 456 (5th Cir. 2004) (per curiam) (unpublished) (citing *United States v. Herrera*, 313 F.3d 882, 885 n.* (5th Cir. 2002) (en banc)). That said, the existence and validity of the settlement agreement are not at issue. Instead, the parties dispute the terms of the settlement. Whether the settlement agreement is ambiguous is a legal question. *See Kenner Fire Fighters Ass'n Local No. 1427 v. City of Kenner*, 09-129, p. 5 (La. App. 5 Cir. 9/29/09); 25 So. 3d 147, 150. The district court's factual findings "are not to be disturbed unless manifest error is shown." *Id.* (citation omitted); *see also Gebreyesus v. F.C. Schaffer & Assocs.*, 204 F.3d 639, 642 (5th Cir. 2000).

**B.**

7

No. 13-30294 cons. w/ 13-30721 & 13-30748

Contracts are interpreted based on the parties' intent. *Prejean v. Guillory*, 2010-0740, p. 6 (La. 7/2/10); 38 So. 3d 274, 279. "The reasonable intention of the parties to a contract is to be sought by examining the words of the contract itself, and not assumed." *Id.* at 279. If the contract is unambiguous and does not have absurd consequences, we apply the ordinary meaning of the contractual language. *Id.* Moreover, we may not ignore an unambiguous contractual provision simply because, in our view, it does not align with the parties' intent. *Id.* Rather, we must interpret "[e]ach provision in a contract . . . in light of the other provisions so that each is given the meaning suggested by the contract as a whole." La. Civ. Code art. 2050. If the contract is ambiguous, however, we may resort to parol evidence to interpret the contract. *Doyal v. Pickett*, 628 So. 2d 184, 187 (La. Ct. App. 2d Cir. 1993). "Any doubtful provisions must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and other contracts of a like nature between the same parties." *Id.*

## C.

On appeal, both parties advance conflicting interpretations of the settlement agreement. Indeed, their disagreement is such that it calls into question the validity of the settlement agreement. *See Crawford v. United Serv. Auto. Ass'n*, 2003-2117, p. 5 (La. App. 1 Cir. 3/24/05); 899 So. 2d 668, 671 ("A compromise is valid only if there is a meeting of minds between the parties as to exactly what they intended at the time the compromise was reached."). Nonetheless, upon reviewing the record, we are convinced that the parties agreed to a settlement, albeit not the version ultimately enforced by the district

8

No. 13-30294 cons. w/ 13-30721 & 13-30748

court.[8] *See Klebanoff v. Haberle*, 43, 102, p. 11 (La. App. 2 Cir. 3/19/08); 978 So. 2d 598, 604 (noting that disagreement over "incidental matters" does not preclude a finding that the parties entered into a compromise).

Although Sundown raises a number of arguments contesting the district court's interpretation of the settlement agreement, Sundown's arguments largely revolve around two alleged errors. First, Sundown contends that the district court erred by ignoring the clear and unambiguous terms of the settlement agreement. Second, Sundown argues that the district court's interpretation contravened the parties' intent. We agree that the version of the settlement interpreted by the district court conflicts with the terms read into the record by the parties.

Because the terms of the settlement agreement are controlled by the parties' intent, see *Prejean*, 38 So. 3d at 279, we will first examine the agreement read into the record. It is clear that the parties agreed on the route Sundown would use to access its facility. Sundown was to use this path to access the dock as well if it acquired the auctioned property. The parties also specified alternative routes for Sundown depending on whether Sundown would need a permit before beginning construction on the road. Haller agreed to not impede Sundown's ability to acquire any permits necessary to fulfill the settlement. In addition, the parties stated that Sundown would begin construction as soon as some preliminary matters were handled. Sundown was also obligated to get at least two separate bids for the different routes. Depending on the route selected, Haller agreed to pay Sundown a portion of the cost.

---

[8] Several times during their recitation of the settlement agreement, the parties repeatedly stated that they had reached a settlement.

No. 13-30294 cons. w/ 13-30721 & 13-30748

The parties agreed that they "would bid against each other in a mandatory buy/sell to purchase the other's co-ownership interest in [the auctioned property] with the high bidder paying its bid price to purchase the other's interest in both tracts." This auction was to occur within thirty days of the parties executing the settlement documents. Although the parties had not agreed on all of the details of the auction, they agreed that the "mandatory buy/sell" would operate like an open auction and the high bidder would own the land. If Haller won the auction, Sundown agreed to use a right-of-way to reach its facility and would not own the dock. Conversely, if Sundown was the highest bidder, it would use the agreed-to-route to access its facility and the dock. In addition, Sundown would give Haller a ninety-nine year recreational lease for a specified area. Lastly, the parties agreed to dismiss the state suit and other pending claims and pay their respective costs.

Here, the district court erred by imposing several terms which either conflicted with or added to the agreement read into the record by the parties. Although the parties gave the district court the authority to enforce and interpret the settlement agreement, the district court did not have the power to change the terms of the settlement agreed to by the parties. In addition to the above terms, the district court imposed a nine-month time limit on Sundown's use of the right-of-way[9] and gave Haller the right to review estimates for the costs of the road to be constructed by Sundown. The district court also mandated that Haller pay his portion of the construction costs within ten days of receiving the bill. As for the auction, the district court stated that the highest bidder would pay the other party the amount of the bid price corresponding to the party's ownership interest. Moreover, the district court

---

[9] If Sundown needed additional time and was not at fault for the delay in the construction, the district court held that Sundown could petition the court for additional time.

found that Haller's ninety-nine year recreational lease encompassed the right to hunt and store fuel on the property and that Sundown would retain the right to lease the property for oil, gas, and mineral exploration with some restrictions.

Although the district court did an admirable job of resolving the disputes between the parties, the court overstepped its authority when it added provisions to the settlement agreement. *See Prejean*, 38 So. 3d at 279 ("Accordingly, when a clause in a contract is clear and unambiguous, the letter of that clause should not be disregarded under the pretext of pursuing its spirit . . . ."). "A compromise settles only those differences that the parties clearly intended to settle . . . ." *Klebanoff*, 978 So. 2d at 605. When limited to the terms recited to the district court, it is apparent that the settlement agreement does not resolve every dispute which could potentially arise. However, that is not required. *See Walk Haydel & Assocs. v. Coastal Power Production Co.*, 98-0193, p. 4 (La. App. 4 Cir. 9/30/98); 720 So. 2d 372, 374 (noting that a settlement agreement is enforceable although it "may encompass less than all the issues between the parties"). Accordingly, we hold that the district court erred when it interpreted the settlement agreement to include those items not mentioned during the parties' oral recitation of the settlement agreement. The district court should have found the settlement agreement to encompass only those matters expressly stated by the parties.

## IV.

### A.

Sundown's arguments challenging the district court's enforcement of the settlement agreement mirror its arguments regarding the district court's interpretation of the agreement. Essentially, Sundown argues that the district court abused its discretion by enforcing a settlement agreement that did not conform to the parties' agreement.

## B.

We review a district court's decision to enforce a settlement agreement for an abuse of discretion. *Quesada v. Napolitano*, 701 F.3d 1080, 1083 (5th Cir. 2012). "A district court abuses its discretion if it (1) relies on clearly erroneous factual findings; (2) relies on erroneous conclusions of law; or (3) misapplies the law to the facts." *Del Bosque v. AT&T Adver., LP*, 441 F. App'x 258, 260 (5th Cir. 2011) (unpublished) (per curiam) (citation and internal quotation marks omitted). Any factual determinations the district court makes when deciding whether to enforce a settlement agreement are subject to the clear error standard. *Deville v. U.S. ex rel. Dep't of Veterans Affairs*, 202 F. App'x 761, 762 (5th Cir. 2006) (unpublished) (per curiam).

## C.

As we stated earlier, the district court erred in its interpretation of the parties' settlement agreement. The district court thus enforced a settlement agreement which differed from the actual agreement read into the record by the parties. We therefore hold that the district court abused its discretion when it enforced the settlement agreement. *See Middlebrooks v. Int'l Indem.*, 95-1364, p. 8 (La. App. 3 Cir. 3/6/96); 670 So. 2d 740, 744 (holding that trial court erred when it imposed a requirement on a party not aligning with the settlement agreement).

## V.

## A.

Lastly, Defendants challenge the district court's denial of their motion for contempt. In its order enforcing the parties' settlement agreement, the district court held, *inter alia*, that "if the platform, lights, and other structures are incorporated into the tract of land, i.e., attached to the property by any means, th[e]n those items are component parts of the land and therefore immovable and are not subject to removal, except by the owner of the

property."    Relying on testimony by Mr. McGuire, the vice-president and general counsel for Sundown, the district court found that the "platform was simply placed over two pilings and could be removed by lifting the pilings." The court also found that "[t]he pediments or pedestals simply rested on the ground and did make a hole but there were no steel pilings."  Moreover, the court held that Sundown retained title to the platform and the Flash Lease was invalid.[10]

Defendants claim that because the platform was immovable, Sundown violated the district court's order when it removed the loading platform from the dock.  Defendants also argue that Sundown no longer possessed a right to the loading platform under the Flash Lease.  In addition, the district court erred, Defendants contend, by holding that they lacked title to the loading platform and that the Flash Lease was invalid.  Defendants allege that these rulings contradicted the district court's prior finding that the lease was binding irrespective of whether Defendants had title to the property.  Defendants also argue that Sundown's status as a co-owner of the disputed land did not give it permission to remove the platform.

**B.**

A district court's decision to deny a motion for contempt is reviewed for abuse of discretion. *Piggly Wiggly Clarksville, Inc. v. Mrs. Baird's Bakeries*, 177 F.3d 380, 382 (5th Cir. 1999).  We review the district court's factual findings for clear error and its legal conclusions de novo.  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 578 (5th Cir. 2000).  The classification of an

---

[10] Under the Flash Lease, Defendants had sixty days to remove their possessions from the leased property before it became the property of the lessor, Flash Gas.  Haller argued below that this sixty-day time period had expired and Sundown was thus prohibited from removing the platform under the lease.

No. 13-30294 cons. w/ 13-30721 & 13-30748

item as movable or immovable is reviewed de novo. *Bayou Fleet P'ship v. Dravo Basic Materials Co.*, 106 F.3d 691, 693 (5th Cir. 1997).

## C.

To establish civil contempt, the moving party must prove by clear and convincing evidence that a party violated "a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *Travelhost, Inc. v. Blandford*, 68 F.3d 958, 961 (5th Cir. 1995) (citation and internal quotation marks omitted). The moving party has presented sufficient evidence if it "produces in the mind of the trier of fact a firm belief or conviction . . . so clear, direct and weighty and convincing as to enable the fact finder to come to a clear conviction, without hesitancy, of the truth of precise facts of the case." *Hornbeck Offshore Servs. v. Salazar*, 713 F.3d 787, 792 (5th Cir. 2013) (citation and internal quotation marks omitted).

"Tracts of land, with their component parts, are immovables." La. Civ. Code art. 462. Under Louisiana Civil Code article 463, "Buildings, other constructions permanently attached to the ground, standing timber, and unharvested crops or ungathered fruits of trees, are component parts of a tract of land when they belong to the owner of the ground." When determining whether an item falls within the scope of article 463, "Louisiana courts generally rely on three criteria: the size of the structure, the degree of its integration or attachment to the soil, and its permanency." *Bayou Fleet P'ship*, 106 F.3d at 693–94.

14

No. 13-30294 cons. w/ 13-30721 & 13-30748

**D.**

As an initial matter, we disagree with Sundown's argument that Defendants' notice of appeal is insufficient. In the notice, Defendants challenge the district court's denial of their motion for contempt.[11]

We hold that the district court correctly denied Defendants' motion for contempt. Sundown only violated the district court's order if the loading platform was immovable. For example, in *Bayou Fleet Partnership*, we found that a limestone working base was immovable property under Article 463. 106 F.3d at 694. The base was "massive in size" and had been undisturbed for a significant period of time. *Id.* Moreover, the base was sufficiently attached to the property because it "actually formed the surface level of the property" and heavy machinery was required to dig the base out of the ground. *Id.*; *see also Smith v. Arcadian Corp.*, 95-87, p. 6 (La. App. 3 Cir. 5/31/95); 657 So. 2d 464, 467 (finding that a reactor was immovable when it was attached to the land with concrete, connected to other equipment with pipes, and attached to a building with steel). Conversely, stockpiles of limestone were movable property despite their massive size because they lacked sufficient attachment and permanence. *Bayou Fleet P'ship*, 106 F.3d at 694.

The district court correctly found that the loading platform at issue is not immovable. Although the platform is substantial in size and was only moved after litigation commenced between the parties, the platform was not permanently attached to the property. Rather, it "was simply placed over two pilings." Moreover, Sundown was able to remove it by lifting the platform from the pilings. In fact, the platform did not lose any of its utility after Sundown

---

[11] Sundown also alleges that Defendants failed to argue below that the Flash Lease prohibited the removal of the loading platform. To the extent that Sundown is attempting to make a waiver argument, we are not persuaded. Defendants raised the issue of the Flash Lease to the district court and, thus, preserved their argument on appeal.

moved it; Sundown used the platform at another location. The pilings were dug into the ground; however, that fact does not demonstrate sufficient attachment to classify the platform as immovable. Ultimately, Defendants have failed to demonstrate that the district court clearly erred in its factual findings.

Contrary to Defendants' argument otherwise, the district court's denial of the motion for contempt did not contradict an earlier ruling. The district court's earlier ruling did not state that the Flash Lease was valid. Rather, the district court merely stated that, under Louisiana law, Sundown could not recover the rent it paid under the lease regardless of whether Defendants actually owned the leased property. This ruling hinged on Sundown's uninterrupted possession of the leased property, not the validity of the lease.

**VI.**

For the above-stated reasons, we REVERSE in part and AFFIRM in part the judgment of the district court.

No. 13-30294 cons. w/13-30721 & 13-30748

JAMES L. DENNIS, Circuit Judge, concurring in part, dissenting in part:

I respectfully concur in part in, and dissent in part from, the majority opinion.

Like the majority, I conclude that the parties entered into a valid settlement and compromise, but I disagree with the majority's conclusion that the district court erred in interpreting and enforcing the parties' agreement with respect to the partition of the lands that they co-owned.

In my view, the district court ultimately and correctly concluded that the parties entered a compromise in open court by which they agreed to partition Tracts 1 and 2, which they owned in indivision, by sale to the highest bidder at a nonpublic auction between only the co-owners. The parties thereby implicitly agreed that the sale proceeds would be divided between the co-owners in proportion to their shares, consistent with a partition by licitation provided for by Louisiana Civil Code article 811.[1]

The parties' conduct and the very language of their compromise reveal that they intended to conduct the auction and distribute the proceeds of the sale as ordered by the district court. Before their compromise, Sundown was suing Haller for a partition by licitation of Tract 1 in state court because Sundown believed that Tract 1 was not susceptible to partition "in kind." The parties' compromise recited in open court expressly contained all of the elements of a partition by licitation of Tracts 1 and 2 as provided for by La. Civ. Code art. 811, except for the proviso that "the proceeds shall be distributed

---

[1] *See* La. Civ. Code art. 811, Revision comment (b): "Partition by licitation is a sale of a thing held in indivision, with the proceeds of the sale divided among the co-owners in proportion to their shares. If the sale of the thing to a third person is excluded by previous agreement, an auction is conducted among the co-owners."

17

to the co-owners in proportion to their shares." However, the parties did not explicitly state how the proceeds would be divided or that they would *not* be divided proportionately as per La. Civ. Code art. 811. Subsequently, the parties participated in an auction between themselves, and they expressed at the auction their mutual understanding that (1) their co-ownership of Tracts 1 and 2 was divided as follows: Haller 57% and Sundown 43%; (2) they were bidding on the total purchase price to be paid in; and (3) the highest bid amount would be distributed according to the proportionate share owned by each co-owner.

Furthermore, Sundown does not anywhere in its briefs set forth or explain any other reasonable interpretation of the parties' compromise that they recited in open court and that they carried out by their conduct towards each other at the auction. Sundown seems to suggest that the parties agreed to a different auction scenario by which each party would bid only for the other party's interest in the two tracts. Even if each party had tried to restrict its bid to what it would pay for the other party's interest, however, each bid would have had to be translated into the total purchase price for the entirety of the two tracts in order to determine who had made the highest bid at the end of the auction, and to give the winning bidder credit for the value of the percentage of the property it already owned. Conducting the auction in the roundabout fashion suggested by Sundown therefore would not have changed the result.[2] The way the parties and the magistrate judge proceeded by having

---

[2] As the magistrate judge explained, there was no other logical, reasonable way to distribute the proceeds than to distribute based on the undisputed percentage ownership interests. Any other distribution scheme would "alter[] Haller's substantive property rights by effectively pretending that he never had an ownership interest in the two tracts at all. . . . Were a third party to have purchased the two tracts, Haller would be entitled to

each party submit its bid in turn as a person bidding on the total purchase price of the two tracts was consistent with the Civil Code and a reasonable interpretation of what the parties recited in open court in their compromise and carried out in their conduct at the auction. Therefore, I have difficulty in finding any persuasiveness in Sundown's argument that the parties agreed to something different from what amounts to a partition by licitation as defined by La. Civil Code art. 811 rev. cmt. (b).

Under the undisputed facts and circumstances here, applying the appropriate Civil Code principles, I see no legal error in the manner in which the district court conducted the auction or enforced its result. La. Civil Code art. 1768 provides: "Conditions may be either expressed in a stipulation or implied by the law, the nature of the contract, or the intent of the parties." The district court, like a Louisiana court that applies the Civil Code concepts and rules by second nature in interpreting parties' contracts, correctly found that the parties here who agreed to a compromise settling a lawsuit that sought a partition by licitation of Tract 1,[3] by holding a non-judicial auction of Tracts 1 and 2 between themselves and excluding third persons, implicitly intended—by the nature of the compromise and its close resemblance to a partition by licitation—that the proceeds of the sale would be divided among the co-owners in proportion to their shares.

---

57.7% of the sale amount. That percentage of ownership does not change simply because the only two bidders at the auction for the property were the parties to th[e] lawsuit."

[3] If Sundown had succeeded in its state court suit, Tract 1 would have been partitioned by licitation; that is, it would have been sold by public auction to the highest bidder, with the proceeds divided between the co-owners, Sundown and Haller, in proportion to their shares. *See* La. Civ. Code art. 811, Revision Comment (b).

No. 13-30294 cons. w/13-30721 & 13-30748

Because an extrajudicial or non-judicial partition agreement is a nominate contract,[4] it is subject to those special provisions in the Civil Code on the contract of partition. *See* La. Civ. Code art. 1916; Andrea Carroll and Richard D. Moreno, 16 La. Civ. L. Treatise, *Matrimonial Regimes* § 7:22 (3d ed. 2013). Such special provisions that apply to partitions include, for example, La. Civ. Code art. 811, instructing that the proceeds of a partition by licitation or private sale shall be distributed to the co-owners in proportion to their shares. Although under the Louisiana Civil Code, "parties are free to contract for any object that is lawful, possible, and determined or determinable," La. Civ. Code. art. 1971, here there is no genuine evidence that the parties intended for the proceeds of the partition sale by non-judicial auction, between the co-owners and excluding third persons, to be divided among the co-owners in any way other than in proportion to each co-owner's share, so the rule provided for in a partition by licitation under La. Civ. Code art. 811 controls.

Furthermore, even if we were to conclude that the compromise entered by Sundown and Haller did not implicitly call for the auction sale proceeds to be divided between them in proportion to each co-owner's share, that open or doubtful provision should be interpreted as provided for by the Civil Code in such a situation. La. Civ. Code art. 2053 provides: "A doubtful provision must be interpreted in light of the nature of the contract, equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties." Article 2054 provides: "When the parties made no provision for a particular situation, it

---

[4] "Nominate contracts are those given a special designation such as sale, lease, loan, or insurance." La. Civ. Code Ann. art. 1914.

must be assumed that they intended to bind themselves not only to the express provisions of the contract, but also to whatever the law, equity, or usage regards as implied in a contract of that kind or necessary for the contract to achieve its purpose." Article 2055 provides: "Equity, as intended in the preceding articles, is based on the principles that no one is allowed to take unfair advantage of another and that no one is allowed to enrich himself unjustly at the expense of another. Usage, as intended in the preceding articles, is a practice regularly observed in affairs of a nature identical or similar to the object of a contract subject to interpretation." Applying these articles here, a Louisiana court would conclude that the express provisions of the settlement agreement and the law, equity, and usage in an agreement of this kind implies, and is necessary for the agreement to achieve its purpose, that the proceeds of the sale should be divided between the parties according to their respective co-ownership shares.

Although the district court may have erred in initially giving the magistrate judge a choice as to how to proceed with the auction, the magistrate judge, and ultimately the district court, correctly perceived and followed the intention of the parties and applied the legally correct interpretation of Louisiana law in the auction, partition, sale, and division of the sale proceeds so that any error in respect to those matters was harmless. Consequently, I would affirm the district court's judgment ordering Sundown to transfer its interest in Tracts 1 and 2 to Haller upon distribution of the net sale proceeds due Sundown for its proportionate share in the co-owned properties. Because Haller is entitled to acquire full ownership of the co-owned properties upon making the payment due, the issues with respect to Haller's 99 year recreational lease and Sundown's mineral rights on those properties appear to

21

be moot, but in an abundance of precaution I would remand them for further consideration by the district court.

On the other hand, I agree with and concur in other parts of the majority opinion, *viz.*, its affirmance of the district court's denial of the Defendants' motion to hold Sundown in contempt; its interpretation and declaration of the parties' agreement with respect to the right of way and road construction giving Sundown access to its property; and its vacating of the district court's imposition of terms as to a nine-month time limit on Sundown's use of a temporary right of way during road construction, Haller's right to review road construction cost estimates, and the requirement that Haller pay his portion of construction costs within ten days of receiving the bill.