EDWIN A. LOMBARD, Judge.
| plaintiff, Fleet Intermodal Services, L.L.C., appeals to this Court a judgment *87 of the district court, following a full bench trial on the merits, denying its claim for interest allegedly due on a contract with defendant, the St. Bernard Port, Harbor and Terminal District, as well as denying its claim for attorney’s fees and costs. For the reasons provided below, the trial court’s judgment in favor of the defendant is affirmed.

Factual and Procedural History

The St. Bernard Port, Harbor and Terminal District (hereafter known as “the Port”) is a public corporation and political subdivision of the State of Louisiana having “complete jurisdiction to regulate all domestic, coastwise, and intercoastal commerce and traffic within the territorial limits of St. Bernard Parish.”[1] Fleet Inter-modal Services, L.L.C., based in Belle Chasse, is a private business engaged in providing logistical services, equipment, and services for domestic projects as well as international shipping. On August 29, 2005, Hurricane Katrina landed ashore in southeast Louisiana and caused well-documented devastation to the entire region, including the near-destruction of St. Bernard Parish. Following Hurricane Katrina, Fleet Intermodal was engaged in providing housing, temporary |2trailers, fuel, and other basic supplies to businesses and government entities in St. Bernard.
On October 4, 2005, the Board of Commissioners of the Port met and discussed the numerous issues and problems affecting the Port as a result of Hurricane Katrina. The Board discussed the rebuilding of its facilities, and how the approval of the Federal Emergency Management Agency (FEMA) would be required for all repair contracts and other Hurricane Katrina-related restoration projects for the foreseeable future. Shortly thereafter, representatives for the Port and Fleet Intermodal met to negotiate a contract in which Fleet Intermodal would provide 30 RV-class temporary housing units, also known as “trailers.” An initial written proposal was created in which the Port would pay Fleet Intermodal $34,000.00 per unit for each trailer, with delivery and setup of each trailer included in the cost. The proposal also included an additional $330.00 per trailer unit for the cost and’Setup of access steps and railings. Thus, the resulting proposal value for the trailer unit was $34,330.00 per unit, with a total proposed contract value of $1,020,000.00. This written proposal also stated that 50% of the payment was a “deposit” that was “[d]ue at Contract Signing or first delivery,” with the “[bjalance Due after Final Unit is Setup.”
On October 7, 2005, a contract was executed by Fleet Intermodal and the Port for the purchase of the trailer units. The contract was signed by Darren Angelo, as owner of Fleet Intermodal, and by Robert J. Scafidel, Ed.D., the Port’s Executive Director, and was properly witnessed by authentic act. The contract differed from the proposal in that only 28 trailer units were purchased. As a result, the contract stated a final price of $961,240.00 for 28 units at $34,000.00 per unit and $330.00 per unit for stairs and railings. The contract, drafted by the Port, Instated that “... the proposal is made a part of hereof and hereby becomes a part of this contract.” A project worksheet form completed by the Port, dated October 4, 2005, was sent to FEMA, requesting the $961,240.00 for 28 “portable temporary housing units.”
Following execution of the contract, Fleet.Intermodal delivered and set up the trailer units and stairs in late October 2005. At the time of final set-up, no payment had yet been made to Fleet Iritermo- *88 dal. It was discussed by the parties upon delivery of the trailer units that the Port was waiting for money from FEMA prior to payment for the units. Shortly thereafter, Fleet Intermodal sent the Port an invoice for the trailer units. The invoice, dated November 4, 2005, contained the following provision: “[pjayment due net 21 days; 24% corresponding APR Interest thereafter.” There was no mention of payment of interest in either the contract proposal or the executed contract itself. In the beginning of every month from January to April 2006, Fleet Intermodal sent finance charge invoices to the Port for alleged interest due on the payment for the trailer units. Fleet Intermodal also sent numerous e-mails to the Port requesting payment of the contract price. The Port did not pay these interest invoices, but submitted Fleet Intermodal’s request for interest along with the contract price invoice of $961,240.00 to FEMA. On or around April 4, 2006, FEMA submitted money to the Port for the 28 trailer units, but not for the invoiced interest payments requested by Fleet Intermodal. The next day, the Port submitted a check to Fleet Intermodal for $961,240.00, serving as the full payment on the contract between the two parties on the delivery and setup of the 28 trailer units.
After sending letters to the Port through counsel requesting payment for alleged outstanding interest payments owed, on August 28, 2008, Fleet Intermo-dal 14filed this lawsuit, a “Petition on Open Account,” in the 34th Judicial District Court. After ample pre-trial discovery, including the taking of depositions, a bench trial on the merits was held in this matter on March 29, 2010. Both parties submitted post-trial memoranda following the day-long trial. The trial court, in a judgment dated May 18, 2010, ruled in favor of the defendant-appellee, the St. Bernard Port, Harbor and Terminal District, and denied Fleet Intermodal’s claims for interest owed on the contract as well as attorney’s fees and costs. The trial court issued written reasons for judgment in favor of the Port. Fleet Intermodal now timely appeals the judgment of the trial court.

Assignments of Eiror

Fleet Intermodal argues that the trial court erred in holding the Port not liable to it for interest owed under its invoices sent following delivery and setup of the trailer units. Specifically, Fleet Intermo-dal argues that the Port accepted the terms of interest by submitting the interest request to FEMA along with the contract price, by marking the invoice “Approved RJS”, and by failing to object to the accumulating interest. Plaintiff also argues that interest automatically began to accrue when the Port failed to tender payment at the time the trailer units were delivered. Appellant further argues that the trial court erred in not awarding it attorney’s fees.

Interpretation of Contracts and Appellate Standard of Review

The burden of proof in an action for breach of contract is on the party claiming rights under the contract. Rebouche v. Harvey, 2000-2327, p. 3 (La.App. 4 Cir. 12/19/01), 805 So.2d 332, 334, citing Vignette Publications, Inc. v. Harborview Enterprises, Inc., 2000-1711, p. 3 (La.App. 4 Cir. 9/12/01), 799 So.2d 5531, 534. The existence of the contract and its terms must be proved by a preponderance of the evidence. Id.
In interpreting contracts, we are guided by the general rules contained in La. Civ.Code arts. 2045-2057. French Quarter Realty v. Gambel, 2005-0933, pp. 6-7 (La.App. 4 Cir. 12/28/05), 921 So.2d 1025, 1029. La. Civ.Code art. 2045 states that the interpretation of a contract is the determination of the common intent of *89 the parties. To ascertain the parties’ intent, the court must first look to the words and provisions of the contract. French Quarter Realty, 05-0933 at p. 6, 921 So.2d at 1029. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in the search of the parties’ intent. La. Civ.Code. art. 2046. The meaning and intent of the parties to a written instrument is ordinarily determined from the four corners of the instrument, and extrinsic (parol) evidence is inadmissible either to explain or to contradict the terms thereof. Ortego v. State, Dept. of Transp. and Development, 96-1322, p. 7 (La.2/25/97), 689 So.2d 1358, 1363.
The issue of whether or not the language of a contract is ambiguous is an issue of law subject to the de novo standard of review on appeal. French Quarter Realty, 05-0933 at p. 3, 921 So.2d at 1027. Contracts, subject to interpretation from the instrument’s four corners without the necessity of extrinsic evidence, are to be interpreted as a matter of law, and the use of extrinsic evidence is proper only where a contract is ambiguous after examination of the four corners of the agreement. Richard A. Tonry, P.L.C. ex rel. Tonry v. Constitution State Service, L.L.C., 2002-0536, p. 3 (La.App. 4 Cir. 7/17/02), 822 So.2d 879, 881. However, “[i]n the interpretation of contracts, the trial court’s interpretation of the contract is a finding of fact subject to the manifest error rule.” French Quarter Realty, 05-j09336 at p. 3, 921 So.2d at 1027-28, quoting Grabert v. Greco, 95-1781 (La.App. 4 Cir. 2/29/96), 670 So.2d 571, 573. This appellate standard of appellate review with regard to contractual interpretations has been recently clarified by this Court as follows:
Where factual findings are pertinent to the interpretation of a contract, those factual findings are not to be disturbed unless manifest error is shown. However, when appellate review is not premised upon any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In such cases, appellate review of questions of law is whether the trial court was legally correct or legally incorrect.
New Orleans Jazz and Heritage Foundation, Inc. v. Kirksey, 2009-1433, p. 9 (La.App. 4 Cir. 5/26/10), 40 So.3d 394, 401, writ denied, 2010-1475 (La.10/1/10), 45 So.3d 1100, quoting Clinkscales v. Columns Rehabilitation and Retirement Center, 2008-1312, p. 3 (La.App. 3 Cir. 4/1/09), 6 So.3d 1033, 1035-36.

Discussion

As stated above, when interpreting contracts under Louisiana law, it is first necessary to review the four corners of a contract as a matter of law, and determine if the trial court was legally correct or incorrect. In the matter sub judice, the contract at issue was executed on October 7, 2005 between Fleet Intermodal, acting through Darren Angelo, its owner, and the Port, acting through Dr. Robert J. Scafi-del. The contract recited a price of $961,240.00 and sufficiently described the 28 trailer units contracted for. The Port drafted the contract and incorporated the terms of the written proposal prepared by Fleet Intermodal. The proposal called for half-payment due at contract signing or first delivery, and a second half payment due after the final unit was set up. The trial court, in its reasons for judgment, stated that neither copy of the written proposal submitted by the parties 17contains any language regarding interest, nor did the final contract of October 7, 2005. Upon our de novo review of the contract and incorporated proposal, we *90 agree. Fleet Intermodal, however, argues that the Port accepted its terms of interest by allegedly approving its November 4, 2005 invoice.
First, we must determine whether the payment of interest stated in the November 4, 2005 invoice was discussed between the parties in any manner prior to its imposition by Fleet Intermodal. During his trial testimony, Darren Angelo, the owner of Fleet Intermodal, was asked by defendant’s counsel of the origins of the invoice calling for 24% APR interest:
Q: Now, you then generated this invoice which calls for 24 percent interest; is that correct?
A: That’s correct.
Q: Did you generate that invoice by an agreement with the Port?
A: With regards to the amount due, yes.
Q: All right, first with the amount due, the $961,240, was the price for 28 units; is that correct?
A: That’s correct.
Q: The language on this invoice that dealt with the interest, the 24 percent, was not agreed to by the Port was it?
A: Well, what was agreed to by the Port was payment on delivery.
Q: But that’s not my question to you. My question is: The 24 percent interest that you put on this invoice was not an agreement with the Port, right? It was not by an agreement with the Port?
A: Not in the contract, no.
Q: The 24 percent that you put on the invoice was something that you did unilaterally; is that correct?
A: Well, it’s company policy; yes.
IsThere is ample additional trial testimony showing that the 24% interest was not agreed upon or even discussed by the parties. While it is clear that the parties did not agree upon imposing the 24% interest unilaterally placed by Fleet Intermodal into its November 4, 2005 invoice, further analysis must be made under Louisiana contract law:
“[UJnlike the common law analysis of a contract using consideration which requires something in exchange, the civil law concept of ‘cause’ can obligate a person by his act ... The difference has been analogized contract-consent approach to a common law contract-bargain approach.”
Bains v. Young Men’s Christian Ass’n of Greater New Orleans, 2006-1423, p. 5 (La.App. 4 Cir. 10/3/07), 969 So.2d 646, 649, writ denied, 2007-2146 (La.1/7/08), 973 So.2d 727. Therefore, this Court must further inquire as to whether the Port consented to Fleet Intermodal’s imposition of interest on the contract for the sale and delivery of the trailer units.
Fleet Intermodal first argues that the Port accepted the terms of interest set in its invoice dated November 4, 2005 by submitting the contract invoice and subsequent interest invoices to FEMA. In support of this argument, appellant insists that trial testimony from Dr. Scafidel, the Port’s Executive Director, in which he testifies to submitting the interest invoices to FEMA, renders him liable for these submitted interest payments. Specifically, appellant argues that the very act of submitting the interest payment request to FEMA shows that the Port viewed the interest payments as valid. The trial court did not accept this assertion, and neither does this Court. The trial court noted: “That was a reasonable thing to do. If he wanted interest, submit to FEMA, see if they felt it was appropriate. It’s not fraudulent. That’s the way things happened down here after the storm.” According |9to testimony from Dr. Scafidel, the Port never agreed to pay the interest *91 charges, but did agree merely to submit Fleet Intermodal’s interest invoices along with the request for payment on the recited contract price. We agree with the trial court’s conclusion: the mere submission of invoices to FEMA did not constitute an acceptance or consent to terms to pay the interest imposed by Fleet Intermodal, which the original contract did not require.
Next, Fleet Intermodal argues that the Port accepted the terms of interest by stamping “Approved RJS” on the invoice. A party who demands performance of an obligation must prove the existence of the obligation. La. Civ.Code art. 1831. A contract is formed by the consent of the parties established through offer and acceptance. La. Civ.Code art. 1927. Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent. Id. “In cases where the law does not expressly create a legal presumption of consent from certain facts, it is left to the discretion of the judge to determine if consent is to be implied from the particular circumstances of the case.” Illinois Central Gulf Railway Co. v. International Harvester Co., 368 So.2d 1009, 1012 (La.1979). “[E]xcept in those instances in which the statutory law creates a legal presumption, the mere silence of an offer-ee should not, in principle, be considered as involving acceptance on his part.” Id. “His consent can result from silence, however, when combined with other facts or acts so as to imply or indicate his consent unequivocally.” Id.
At some time before the Port issued payment for the trailer unit contract price on April 5, 2006, an employee of the Port marked the November 4, 2005 invoice “Approved RJS.” Fleet Intermodal argues that this act resulted in consent |into the 24% interest rate written on the invoice. At trial, Dr. Scafidel acknowledged the existence of the “Approved RJS” stamp on this invoice:
A: I had my secretary stamp it.
Q: Correct. After you reviewed it, correct?
A: Yes.
Q: And you had her stamp “Approved RJS” on there, correct?
However, Dr. Scafidel denied that it was an approval to pay interest. He stated that it was his understanding that it was an approval to pay the agreed-upon contract price listed on the invoice: $961,240.00:
Q: You were asked about the “approved” stamp on the document. Why was it put there and when was it done?
A: That is the submission of items to be paid are submitted to my office, and I review everything, and if I find the invoice has all the proper approvals on the invoice, then that stamp is made so accounting knows that they can proceed and cut the check. But that approval is done for the invoice, but it doesn’t have a date or anything. So, this could have happened, well, it did happen in April.
Q: If that invoice was approved with the interest would it have an interest calculation on it?
A: It should before we would approve it ...
... Q: Did the Board, the Port, the Commissioners ever approve the payment of the interest?
A: No.
Despite this testimony, Fleet Intermodal argues that its invoice with the 24% interest constituted an offer, and that the Port’s stamp constituted an acceptance. Appellant cites New Orleans Medical Sales and *92 Services, Inc. v. Brown, 398 So.2d 1194 (La.App. 4 Cir.1981), in support of this argument. However, we agree with In the trial court’s written reasons, and find the cases easily distinguishable. The trial court in the matter sub judice correctly stated the distinction between the two cases:
(In New Orleans Medical) ... the defendant’s doctor ordered a piece of medical equipment from the plaintiff to be delivered to the defendant. Id., at 1195. Upon delivery, the defendant signed an invoice from the plaintiff that contained the words “Buyer accepts the terms and conditions set forth below” below the signature line and a number of terms, including interest and attorney’s fees. Id. The court reasoned that since the defendant received the equipment, signed his name above the payment terms, and used the equipment, he was obligated to pay for it. Id., at 1196.
The facts in this case and those in the New Orleans Medical case are easily distinguished. In both cases, there was a delivery of goods and the expectation of payment. However, in the New Orleans Medical case, the defendant explicitly made his first payment agreement and arrangements by signing the invoice. There was no preexisting contract. In this case, the Port and Fleet confected their agreement before the trailers were delivered. Further, the invoice in the New Orleans Medical case clearly stated that by signing it, the defendant was binding himself to the terms of the invoice. Fleet’s invoice merely states that interest will begin accruing after a certain time had passed as if it were merely reciting the terms of the agreement already made. The invoice does not purport to make a new agreement or modify the existing one.
(Emphasis added).
Upon our review of the trial testimony, we agree with the trial court in this matter that “under the circumstances, there is no clear indication of the Port’s consent to be bound to pay interest.” Dr. Scafídel’s testimony clearly showed that the stamp was merely an authorization to pay the invoice amount; the contracted-for $961,240.00. There were no interest calculations made at any time by the Port. The testimony of the Port’s employees indicates that no one from the Port agreed in any way to accept Fleet Intermodal’s unilaterally imposed terms of interest. This is also evidenced by the fact that none of the interest-only invoices sent to the [ 1gPort between January and April 2006 were approved or acted upon. And as stated above, the Port’s mere submission of the interest invoices to FEMA cannot be considered to be an acquiescence to pay the 24% interest. It cannot be said that the Port agreed to the terms of interest. Nor it can it be said that, given the testimony of the Port’s employees, that the Port approved the interest by silence. Therefore, we find no error in the trial court’s determination that there was no consent to payment of interest.
Fleet Intermodal next argues that the trial court erred in not finding that it is owed interest automatically under La. Civ. Code arts. 1989, 2550, and 2553[2]. La. Civ.Code art. 1989 states that “[d]amages for delay in the performance of an obli *93 gation are owed from the time the obligor is put in default. Other damages are owed from the time the obligor has failed to perform.” Fleet Intermodal argues legal interest is due as a result of the Port’s failure to timely pay under the terms of the proposal, which was made part of the contract. Fleet Intermodal is correct in that the contract proposal called for 50% payment at contract signing or first delivery, and for the balance to be due after final setup. However, the contract does not provide for any penalties in the event of non-payment at this time.
More importantly, the trial testimony shows that appellant was certainly aware of the requirement that FEMA would be reimbursing the Port, and that payment could not be made until FEMA approved the project and provided the money. At trial, Dr. Seafidel testified as such:
11SQ: Did you talk to Mr. Angelo about the price of these trailers and when it was to be paid at your meeting with him?
A: The only thing I said to Mr. Angelo and to everyone there is that this is contingent upon our receipt of funds from FEMA, because in all honesty, the Port did not have that amount of money.
Q: And had the project been approved by FEMA at that point?
A: We had a verbal approval, yes.
David McClain, the Port’s Director of Operations at the time, testified that he first received an interest-only invoice from Fleet Intermodal in January 2006, and that he had numerous conversations with Mr. Angelo with the mutual understanding that Mr. Angelo would be paid only after FEMA approved the contract and reimbursed the Port:
Q: And before these invoices were issued in January, you didn’t have any conversation with him about that, right?
A: No.
Q: Never entered your mind that they were going to charge interest; is that right?
A: No.
Q: How many times did you have a conversation with Mr. Angelo about the fact that Intermodal would not get paid until FEMA paid the money to the Port?
A: Numerous. At least six, eight times.
In this matter, the Port, as obligor, was not at any point placed in default. As the trial court correctly noted, “[t]he Port failed to pay on the schedule laid out in the contract and proposal, yet nowhere in either document did the parties define the consequences of default.” In fact, we find that, based on the trial testimony, all | ^parties were aware that payment would not be made to Fleet Intermodal until FEMA approved the contract. La. Civ. Code art. 1927.
Trial testimony further indicates that Mr. Angelo had attended meetings where it was discussed that payment would be forthcoming from FEMA, as was the case in countless other personal and commercial payments following Hurricane Katrina. Mr. Angelo had testified that he was aware that some payment or approval process was coming from FEMA. Appellant was also aware of the project worksheet which stated the contract price of $961,240.00 and was approved by FEMA on October 4, 2005. As soon as this payment was made by FEMA, appellant received payment in full on the contract price. Therefore, this Court finds that no damages are owed to appellant for “default” under La. Civ.Code art. 1989.
For these reasons, and because the October 7, 2005 contract between the parties did not stipulate any penalties or consequences of non-payment, we find no valid *94 claim for interest under La. Civ.Code arts. 2550 and 2553. The contract, through the proposal made part thereof, stipulated a time for payment and a time when the price was due, but appellant was fully aware that payment would not be made until FEMA tendered payment to the Port.
Appellant’s final argument on appeal is that it is owed attorney’s fees for having to pursue its claim on an alleged open account under La.Rev.Stat. 9:2781. Appellant correctly points out that in Frey Plumbing Company, Inc. v. Foster, 2007-1091, p. 5 (La.2/26/08), 996 So.2d 969, 972, the Louisiana Supreme Court rejected pri- or multi-factor tests in determining what constitutes an “open account” for the purpose of obtaining attorney’s fees under the statute, and held that an |1s“open account” is clearly defined by the statute itself.[3] The Court held that the statute, which in Subsection D defines an open account, “must be applied as written.” Id., p. 6, 996 So.2d at 972.
Nevertheless, upon our plain reading of La.Rev.Stat. 9:2781, we cannot conclude that appellant is owed attorney’s fees for bringing suit on an open account. For the reasons already provided above in this opinion, the contract between Fleet Inter-modal and the Port was fulfilled as a result of the Port’s payment of $961,240.00 on April 5, 2006, immediately after receiving funds from FEMA. It is undisputed that the Port paid the full contractual amount well within thirty days, and so attorney’s fees are not owed on the contract amount under La.Rev.Stat. 9:2781. Since this Court also concludes that there was no consent to terms of interest unilaterally imposed by Fleet Intermodal, there are no attorney’s fees owed to appellant for pursuing its interest claim, either. See Newman v. George, 2007-0620, pp. 7-8 (La.App. 4 Cir.9/26/07), 968 So.2d 220, 225-226. In essence, because plaintiffs primary claim for interest fails, its underlying claim for attorney’s fees under La.Rev. Stat. 9:2781 also fails.
| if¡ Conclusion
Upon de novo review of the October 7, 2005 contract between Fleet Intermodal and the St. Bernard Port, Harbor and Terminal District, we find that the contract itself and the proposal therein made no mention of interest to be owed in the event of default or non-payment. Our review of the trial testimony reveals that the Port did not consent to any terms of interest. Nor do we find that the Port’s sub *95 mission of Fleet Intermodal’s interest invoices to FEMA constitutes an acceptance of interest terms.
Although the contract proposal called for payment upon final set-up of the units, it was well established at trial that all parties knew payment would not be made until FEMA approved the project and issued payment on the contract amount. Once payment was made, the Port immediately issued payment on the contractual amount of $961,240.00 to Fleet Intermodal. Therefore, no legal interest is owed to appellant under La. Civ.Code arts. 1989, 2550, and 2553. Because plaintiffs interest claim fails, so does its claim for attorney’s fees under La.Rev.Stat. 9:2781. Decree
We find no error in the trial court’s judgment denying Fleet Intermodal’s claim for conventional interest, attorney’s fees, and costs. The judgment of the trial court is affirmed.
AFFIRMED

. La.Rev.Stat. § 34:1701.

. La. Civ.Code art. 2550 provides:
Payment of the price is due at the time and place stipulated in the contract, or at the time and place of delivery if the contract contains no such stipulation.
La. Civ.Code art. 2553 provides:
The buyer owes interest on the price from the time it is due.

. La.Rev.Stat. 9:2781 provides in pertinent part:
A. When any person fails to pay an open account within thirty days after the claimant sends written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant. Citation and service of a petition shall be deemed written demand for the purpose of this Section. If the claimant and his attorney have expressly agreed that the debtor shall be liable for the claimant’s attorney fees in a fixed or determinable amount, the claimant is entitled to that amount when judgment on the claim is rendered in favor of the claimant. Receipt of written demand by the person is not required.
... D. For the purposes of this Section and Code of Civil Procedure Articles 1702 and 4916, “open account” includes any account for which a part or all of the balance is past due, whether or not the account reflects one or more transactions and whether or not at the time of contracting the parties expected future transactions. “Open account” shall include debts incurred for professional services, including but not limited to legal and medical services. For the purposes of this Section only, attorney fees shall be paid on open accounts owed to the state. (Emphasis added).