DANIEL L. DYSART, Judge.
| j Defendant Palm Energy Offshore, L.L.C., appeals the judgment of the trial court, rendered following a full bench trial on the merits in fayor of the plaintiffs, Red Willow Offshore, L.L.C., and Medco Ener-gi US, L.L.C., in the amount of $1,163,576.90, for damages incurred in connection with a gas processing contract. For the reasons that follow, we affirm the judgment of the trial court.
BACKGROUND:
Red Willow Offshore, L.L.C., and Medco Energi US, L.L.C. (hereinafter “Red Willow” or collectively as “plaintiffs”) were co-working interest owners in State Lease 18383, No. 1 Well. They entered into a Production Processing Agreement (“PPA”) with Palm Energy Offshore, L.L.C. (“Palm”) as the processing facility operator. In. the spring of 2007, plaintiffs successfully completed the “Well,” which held a production of natural gas. Red Willow did not have facilities to produce the Well and began negotiations with Palm, an operator with, its own wells and a production processing facility, located on the West Delta Block 54, known as Tank Battery No. 3 (“Palm facility”), on a different lease held |2by Palm approximately four miles from the Well. The.Palm facility had previously been approved, by the Louisiana Department of Natural Resources (“LDNR”) for the commingling of gas, oil and condensate streams from wells owned and operated by others.
Red Willow and Palm entered into a PPA, effective October 1, 2007, which provided for Red Willow’s production stream of natural gas from the Well to be transported by pipeline to the Palm facility for commingling, processing and preparation for the ultimate sale hy Palm. Thereafter Palm would deliver the processed gas stream to the Tennessee Gas Sales Pipeline (“the sales, line”), which was connected to the Palm facility. Palm was to allocate volumes to each of the producers based upon the metered amount of gas that exited the facility at the sales line. Red Willow was to pay Palm a monthly fee for, the processing services and use of the Palm facility.
In 2010, plaintiffs hired a national auditing firm, Martindale Consultants (“Mar-tindale”), to conduct an audit of the gas allocations. On April 6, 2011, Martindale issued its report concluding that Palm had diverted a percentage of Red Willow’s gas allocation prior to its reaching the sales meter by using it as “lift gas” in Palm’s low pressure wells.[1] The Red Willow well was a high pressure natural gas well *296 which required no lift gas. As a result of the diverted gas, Red Willow contended that it received significantly less gas allocation resulting in lost revenue in the amount of $1,163,576.90, for the period of January 2008 through May 2010. -
laRed Willow and Medco Energi US, L.L.C. (“Medco”) filed a suit for breach of contract, conversion and/or unjust enrichment alleging that Palm was obligated to allocate plaintiffs' gas production volumes evenly and was not authorized to use Red Willow gas production volumes for lift gas without'compensation. After trial, a judgment was rendered in favor of plaintiffs finding that Palm had breached the terms of the PPA.[2] Palm timely appealed the judgment.
DISCUSSION:
The party claiming rights under a contract bears the burden of proof. Fleet Intermodal Services, L.L.C. v. St. Bernard Port, Harbor and Terminal Dist., 10-1485, p. 4 (La.App. 4 Cir. 2/23/11), 60 So.3d 85, 88. The existence of the contract and its terms must be proved by a preponderance of the evideiice. Id., 10-1485, p. 5, 60 So.3d at 88. Thus, plaintiffs had to prove by a preponderance of the evidence that: (1) defendants owed them an "obli gation; (2) defendants failed to perform that obligation; and (3) defendants’ failure resulted in damages to plaintiffs. Hayes Fund for the First United Methodist Church of Welsh, LLC v. Kerr-McGee Rocky Mountain, LLC, 14-2592 (La.12/8/15), p. 4, — So.3d -, 2015 WL 8225654; Favrot v. Favrot, 10-986, pp. 14-15 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, 1108-09; also see 2 Saul Litvinoff, La. Civ. Law Treatise: The Law of Obligations 378-87 (1975). Whether defendants’ actions caused plaintiffs’ damages is a question of fact, which should not be reversed on appeal absent manifest error. Hayes Fund, supra; Detraz v. Lee, 05-1263, p. 7 (La.1/17/07), 950 So.2d 557, 561; Housley v. Cerise, 579 So.2d 973, 979 (La.1991).
When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties’ intent. Id.; French Quarter Realty v. Gambel, 05-0933, p. 6 (La.App. 4 Cir. 12/28/05), 921 So.2d 1025, 1029. The meaning and intent of the parties to a contract is determined ordinarily from the four corners of the instrument, and extrinsic or parol evidence is not admissible either to explain or to contradict the terms thereof. Ortego v. State, Dept. of Transp. and Dev., 96-1322, p. 7 (La.2/25/97), 689 So.2d 1358, 1363; Fleet Intermodal, supra, 10-1485, p. 5, 60 So.3d at 89.
In New Orleans Jazz and Heritage Found., Inc. v. Kirksey, 09-1433, p. 9 (La.App. 4 Cir. 5/26/10), 40 So.3d 394, 401, this Court clarified the appellate standard of review with regard to contractual interpretations:
Where factual findings are pertinent to the interpretation of a contract, those factual findings are "not to be disturbed unless manifest error is shown. However, "when appellate review is not premised on any factual findings made at the trial level, but is, instead, based upon an independent review and examination of the contract on its face, the manifest error rule does not apply. In. such cases, appellate review of questions of law is whether the trial court was legally correct or incorrect..
In this casé, the trial court determined that extrinsic evidence "was required to *297 determine the intent of the 'Contract. We have reviewed the contract de novo and |sagree with the trial -court’s determination. Therefore, we shall review the trial court’s factual findings applying the manifest error standard of review.
Accordingly, the issue to be resolved on review is not whether the trial judge was right or wrong, but whether he was reasonable in his.fact-finding conclusions. We are mindful of our role in this review as most recently articulated by the Louisiana Supreme Court in Hayes, supra: “However persuasive the argument, the appellate court does not function,..as a choice-making court; the appellate court functions as an errors-correeting court.” 14-2592, p. 1, — So.3d —, 2015 WL 8225654.
Initially, we address Palm’s contention that Red Willow failed to properly extend its right to make written exceptions to Palm’s allocations for the 2008 calendar year. Palm argues that Red Willow is not entitled to damages associated with the reallocation of 2008 gas allocation statements. It argues that although it gave Red Willow an extension of the right to audit the 2008 statement, this did' not extend the period for Red Willow to except to the allocation as per the terms of the PPA.
We find that the. record supports the trial court’s ruling in favor of Red Willow on this issue. Red Willow repeatedly demonstrated at trial that Palm understood that Red Willow had properly preserved its right both to audit and make exceptions to Palm’s allocations.
Roger Gann of Martindale Consultants, Inc., the firm hired by Red Willow to conduct the audit, sent an email on November 16, 2010, to Palm’s controller, Mr. Galjour, stating:
With the holidays upon tis, I would like to request an extension for the parties audit rights on the 2008 transactions and propose doing the. review in January/February of 2011 with the promise of issues. identified during the review discussed at that time and a | (¡report issued within 30 to 45 days after completion of the review.
Also on November 16, 2010, Palm’s senior revenue accountant, Catherine Bayhi, responded to an email from Mr. Galjour regarding the audit, and citing to Section 8.2 of the PPA, stated:
Red Willow is within the 24 month deadline ... They made the deadline by 6 weeks for the 2008. data.
A few weeks later, Mr. Galjour executed a written agreement “to extend [Red Willow’s] 2008 audit rights in 2011.
On appeal, Palm contends that the use of “audit - rights” in the extension agreement means that only-the time period for the physical review of Palm’s books and records was extended, and not the concomitant right to seek reimbursement for mis-talles , or misallocations revealed by the audit. However, at trial Mr. Galjour admitted, that he understood than an extension of the audit rights would,. likewise extend the right to request adjustments:
Q. When you signed [the extension agreement], you thought you were extending Red Willow’s rights to request adjustments to the 2008 allocations, correct?'
A. Correct.
Louisiana Civil Code art. 2045 explains that “[i]nterpretation of a contract is the determination of the common intent'of the parties.” ‘Additionally, "while the words of a contract must be given their generally prevailing meaning, words of art and technical terms must be given, their technical meaning when the contract involves a technical matter. La. Civ. Code art. 2047; *298 Schroeder v. Board of Supervisors, 591 So.2d 342, 345 (La.1991); Kenner Fire Fighters Ass’n Local No. 1427 v. City of Kenner, 09-129, p. 5 (La.App. 5 Cir. 9/29/09), 25 So.3d 147, 150. A doubtful provision must be interpreted in light of the nature of the contract, |7equity, usages, the conduct of the parties before and after the formation of the contract, and of other contracts of a like nature between the same parties. La. Civ. Code art. 2053; Campbell v. Melton, 01-2578, p. 11 (La.5/14/02), 817 So.2d 69, 78; Amend v. McCabe, 95-0316, p. 8 (La.12/1/95), 664 So.2d 1183, 1187-88.
The phrase “audit rights” is a technical term; therefore, we must give it its technical meaning when interpreting the extension agreement. See La. Civ. Code 2047. “Audit rights” is a phrase commonly used in the oil and gas industry, and is understood to include the right to audit an operator’s costs and revenue allocations as well as the right to request adjustments to cost or revenue allocations through written exceptions.
The trial court found that the parties intended to extend both Red Willow’s right to audit and to request an adjustment. See La. Civ. Code art. 2046. Our review of the record confirms that' the parties intended'to extend the right to audit and to seek adjustments.
We next examine the contract between the parties to determine whether Red Willow carried its burden of proving that Palm failed in its obligation to Red Willow resulting in damages.
. The PPA. is the sole agreement between the parties. Under the terms of the PPA, Palm contracted with Red Willow to process production from the Well, then to commingle it with production from other wells, and to deliver the processed gas and liquids to the sales. line.[3] There is no dispute that the PPA is silent as to the use of lift gas.
IsSection 2.2 of the PPA sets forth Palm’s obligations as follows:
Palm’s responsibilities for processing [plaintiffs’] Production shall commence at the inlet flange of the dedicated high-pressure and lów-pressuré'' separators for the Well and shall cease at Tank Battery #3 in West Delta Block 54. Palm shall redeliver [plaintiffs’] processed oil or condensate from the Facility at the outlet flange connection downstream of the Chevron LACT meter at Tank Battery # 3 in West Delta Block 54, at which point Palm shall redeliver the processed condensate' or oil into the pipeline connecting with the Chevron pipeline at Tank' Battery' #3 in West Delta Block 53, for the benefit of [plaintiffs]. Palm shall’ redeliver [plaintiffs’] processed gas to the Tennessee ’ Gas Pipeline sales meter located on the Facilities.
There is nothing in the PPA that deals with lift gas or provides that Palm could use gas that .it was processing at its facility for lift gas in its own wells.
Thus, an express reading of the PPA demonstrates that Palm did not have the right to use Red Willow’s gas as lift gas. The purpose of the PPA was to take Red Willow’s gas; process it, and redeliver it for sale. The PPA specifically provides that Palm “shall perform the following processing services” of bulk separation, *299 dehydration of gas, treatment and disposal of produced water, metering of water, gas condensate and oil, chemical injection and reinjection (and compression) of gas, condensate or oü into the respective sales lines. Palm’s defined processing obligations do not address lift gas because none of these processing activities involve the use of lift gas. In fact, Palm admits the use of lift gas is not even a processing activity; rather, it is an operational function.
It is undisputed that after processing Red Willow’s gas at the facility, Palm diverted significant volumes of sales-ready gas to be used in the lift gas operations |afor Palm’s own oil wells. Palm’s wells that used lift gas were not located at the facility and were not part of the' same lease or unitized operations as the Well. The Well was not on lift gas and did not receive any benefit from lift gas. Only Palm bene-fitted from its use of lift gas. Palm concedes that it did not compensate Red Willow for the use of this gas, nor did it pay for, or otherwise charge the other wells that used lift gas for the price of the gas.
Palm claims that it did not breach the PPA because it technically complied with the formula and, further, that lift gas was noted on the schematic design of Palm’s Tank Battery No. 3. Therefore, Red Willow should have known that lift gas would be used. We find Palm’s: position is flawed.
The PPA expressly defines Palm’s processing obligations, none of which involve diverting the commingled gas stream that contained Red Willow’s sales ready gas from the processing platform' to Palm-owned wells for use as lift gas.
Article 6 of the PPA provides for the commingling and measurement standards to be used by Palm in allocating gas volumes and processing costs among the respective producers. It expressly recognizes that processing results in a reduction of production volumes actually available for sale, and accounts for losses due to fuel use, flaring! and shrinkage (known as “Fuel, Flare & Losses”). Notably, there is no provision for lift gas.
The American Petroleum Institute (“API”) Manual, which is expressly referenced and adopted in Section 6.2 of the PPA, explains that. “[allocation measurement was developed to reduce capital and operating costs without sacrificing the objective of treating;.all,parties fairly and equally” and “provides a sound basis for distributing production or income.” The API Manual stressés that “[mjethods to account for fuel gas, lift gas, flare gas, and the like must be included | inin the design of an allocation program.” (emphasis added.) The Manual sets forth the , proper method to ensure an equitable allocation:
When performing a gas allocation, the user is simply correcting the theoretical volume of gas' or energy at the well site to a known volume of gas or energy sold. This exercise is necessary wherever one gas stream is commingled with another. This is done by prorating the theoretical amounts of gas available for sales to actual sales amounts....
Once this number is adjiisted for any fuel gas, flare gas, lift gas and other such gases, an available sales volume can be obtained, (emphasis added.)
Statewide Order No. 29-D-l, which likewise adopts the API manual, requires an operator to complete a commingling application certifying that the method used for allocation of production “will provide reasonably accurate measurement, will not create inequities, and will afford the owner of any interest the opportunity to recover his just and equitable share of production.” Palm so certified in its Commingling Application. Finally, the Council of Petro *300 leum Accountants Societies’ (“COPAS”) Gas Accounting Manual, which- provides additional guidance as to industry standards on gas accounting provides:
It is often necessary for a producer to obtain lift gas from sources other than ■ the lease being lifted. It may be purchased from outside suppliers or transferred from another lease, belonging to the producer. If the gas is purchased from art outside source, the using lease is charged based on the price paid to the supplier. (Emphasis added).. > : - .• >
Undoubtedly, these provisions require an operator to account for and properly allocate to its producers the value of the gas it uses as lift gas. ,
Palm’s owii allocation software recognizes ' the need to account for gas purchased or used for lift gas. Heaven .Frilot, Palm’s Production Analyst,- .Inspecifically explained that she used the accounting software Procount AnalystTM to prepare Palm’s monthly gas allocations. Palm’s Monthly Gas Allocation Summary, generated by- the Procount AnalystTM software, included a specific line item for “Purchased Gas,” a reference to gas obtained off-lease for fuel or lift purposes. However, Ms. Frilot admitted that, data for this line item was not included in accounting for the Red Willow allocation.
Palm argues that it did not have to account for the gas used as lift gas on the basis that all such gas is recovered and returned. to: the system. They argue the lift gas ..volumes are re-circulated and reused in the field and not sold, so volume adjustment is not. necessary. However, Palm did not provide any technical evi■dence or testimony to support this contention.
Roger Gann, called as an expert by Red Willow, provided a clear illustration disproving Palm’s contention tliat the lift gas was not consumed. In August of 2008, Red Willow’s theoretical number (the amount produced at the Well and piped to the Palm facility) was 40,591.94 Mcf[4], yet Red Willow; was only allocated 30,573 Mcf at the sales line. Therefore, ten million cubic feet of gas produced by Red Willow at the Well was unaccounted for.
To further illustrate Gann examined wells, the Red Willow well and two Palm wells that were, commingled at the Palm processing facility. The Red Willow production to the facility was 41,236 Mcf, which represents seventy-five percent of the three wells total production of 55,309 Mcf. Red Willow used zero lift gas. Palm Well No. 2 in the example used 11,000 Mcf to produce 7000 Mcf, and, therefore, used more lift gas than oil actually produced. As Palm’s allocation |iamethod did not include lift gas, Red Willow .was only allocated 30,888 Mcf, losing 6,500 Mcf to the two Palm wells. Clearly, the example demonstrated that lift gas was used to aide in the production of Palm’s wells, and not properly credited to Red Willow.
- As Palm argues, Section- 6.4 of the PPA sets forth the gas allocation method. In fact, in Palm’s response to the audit in its letter dated May 25, 2011, Palm set forth in. Audit Exception No. 3:
This field is a re-circulating lift .gas field. Since lift, gas volumes are recirculated and reused in the field and not sold, no volume adjustment is necessary. The PPA contemplates the application of industry standards for method *301 ology as to how to allocate gas. As provided in section 6.4e of the PPA, “Fuel, Flare and Losses shall be considered the difference between the total measure at the well test separators and Tennessee Gas Pipeline Sales Volume as measured on the Facility”. By executing the PPA, all parties have agreed to accept these losses equally. Section 6.4 of the PPA clearly differentiates between gas sold and gas not sold. Lift gas volumes were not sold, (emphasis added.)
There is ho mention of lift gas in the allocation. Had lift gas been’contemplated, it follows that it should have been mentioned along with “Fuel, Flare and Losses,” in the PPA.
Palm’s expert, Oscar Hartman admitted that his opinion that Palm was in compliance with the PPA was based on the assumption that all gas. used as lift gas was returned; however, he testified that this particular well was not a continuous lift well, but rather, an intermittent lift well.[5] Mr. Hartman further acknowledged 11Bthat several well tests taken from the facility indicated a negative production, or as Mr. Hartman conceded, “less came out than went in.”
The evidence introduced at trial[6] demonstrates that Palm agreed that Red Willow should be compensated for any gas that is lost in the lift gas process:
Q. Lift gas is going off-site from West Delta 54 to service Palm wells in West Delta 52, correct?
A. Yes.
Q. Some of that lift gas is being taken from or diverted from production that 'belongs to Red ■ Willow, correct? A. Could be, yes.
Q. If' that gas is not ultimately returned to á sales Tibe, for some reason there’s á lo'ss, would1 ybü agree that Red Willow should be compensated for that gas? . ’
A.' Yes.
We agree with the. trial c.ourt that based on the record evidence, .the allocation method set forth in the PPA did not include the use of Red Willow’s gas as lift gas in Palm’s oil wells, ■ Whether, by de: sign or . not, Palm’s allocation methodology resulted in a decrease in .the allocated sales volumes and corresponding revenue stream attributed .to the Well. As the trial court correctly concluded, Palm’s failure to fully, compensate Red Willow for this decrease constituted a breach of the PPA.
Palm additionally assigns as error, the trial court’s acceptance of the reallocation method conducted by Martiridale. Martindale’s audit was methodical and properly reconstructed the allocation of production volumes and costs for the Well from January 2008 through year-end 2009. Martindale’s method, consistent with the PPA and COPAS, recognizes that Palm failed to account for gas volumes used in lift gas operations. In doing so, Palm effectively converted the cost associated with lift gas operations into processing costs. . Accordingly, 114Martindale’s reallocation determines-the volume of gas that would have been available for sale but for Palm’s use of that gas for its own operational purposes. In essence, Martindale’s audit treats gas diverted to lift gas as “purchased” by Palm.
*302 Martindale’s audit- began by taking the monthly theoretical production for each well based on well tests (as required by the PPA) and comparing it to the allocated production volume paid that month (Palm’s monthly sales allocation). .Martindale then looked at the volumes of gas diverted for lift gas, charged those wells that actually used the lift gas accordingly, and ultimately calculated the value of such gas. Mar-tindale determined Red Willow’s share of diverted lift gas volumes to ' be $1,163,576.90. At trial, Palm did not challenge or contest these calculations.
Palm also does not dispute that the sales volume actually attributed to Red Willow on a monthly basis was on average approximately twenty-three percent below the theoretical production volumes. Red Willow’s expert provided the calculation as to how the use of lift gas by Palm reduced the volume of Red Willow product. In August 2008, the total theoretical production for all wells that used the facility was 205,157.18 Mcf. Accordingly, the total theoretical volume available for sale was 197,-936.42 Mcf, but Palm’s actual sales allocation for that month was just 127,187.00 Mcf. Based on Palm’s own records and allocation worksheet, 55,930.99 Mcf was expended on lift gas operations. These lost volumes were spread out over all wells as a facility processing loss. Martindale determined that in August 2008, Red Willow’s gas volume available for sale should have been 37,553.04 Mcf, as opposed to the 30,573.25 Mcf Palm credited to it. Under this approach, the difference between theoretical and actual | ^production is more appropriately in the 5-10% range (as opposed to the 30% variance under Palm’s allocation). The PPA itself defines a variance of 2% for meter volume readings as material, and Palm’s corporate representative, Ms. Frilot, admitted that an average difference of over 20% is beyond her range of tolerance.
Palm argues that Red Willow failed to establish that these differences were the result of Palm’s use of lift gas. But Palm’s own allocation for the one month it did not use lift gas demonstrates otherwise. In September 2008, Palm’s gas-lifted wells were not in service due to the presence of a hurricane in the Gulf of Mexico. Thus, no lift gas was taken from the facility. Red Willow’s allocated sales- volume for that month was 5,857.36 Mcf, within 1% of its theoretical/well test volume of 5,898.08 Mcf. The difference between theoretical production and allocated production for the other non-lift gas wells were all within a 5% range. Yet in all other months, that variance averages approximately 23%. The difference is due to the lift gas being taken out of the equation, thus allowing the full voluine of gas available for sale to flow to the sales line. Martindale’s allocation achieves a similar result by properly accounting for lift gas volumes that should have been considered available for sale (or purchased by Palm) and ensuring that each well is being credited its fair and equitable share of production.
In addition to.the testimony of Martin-dale auditor,-Roger Gann, Red Willow presented at trial David Lerman, who was offered and accepted by the trial court as an expert in oil and gas operations, production allocations, and industry customs and standards. Mr. Lerman confirmed the Martindale audit and offered his opinion that Martindale had accurately accounted for and valued the Red Willow gas that Palm had diverted for lift gas purposes.
~ hfiThe trial court stated in its written reasons for judgment that it found the testimony of the experts presented by Red Willow to be more credible. When a trial court’s ruling is based, at least in part, on weighing the credibility of wit *303 nesses, its ruling cannot be manifestly erroneous. Adams v. Rhodia, 07-2110, p. 10 (La.5/21/08), 983 So.2d 798, 806-07; Westcott v. Westcott, 08-1339, pp. 15-16 (La.App. 4 Cir. 4/17/09), 11 So.3d 45, 56. “The rule that questions of credibility are for the trier of fact applies to thé evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.” Westcott, supra, 08-1339, p. 16, 11 So.3d at 56, citing Galen-Med, Inc. v. Porter, 05-0788, p. 14 (La.App 4 Cir. 3/29/06), 928 So.2d 681, 689.
We see no basis on which to disregard the trial court’s acceptance of Red Willow’s expert testimony regarding proper allocation to Red Willow pursuant to the PPA, and we find there was a reasonable basis for the factual conclusions made by the trial court.
Accordingly, for the reasons set forth herein, we affirm the judgment of the trial court.
AFFIRMED

. Gas lift is a method of artificial lift that uses an external source of high-pressure gas for supplementing formation gas to lift the well fluids.

. Having decided that Palm had breached the terms of the PPA, the trial court did not reach the merits of the conversion claim.

. The Tennessee Gas Sales Pipeline is a set of natural gas pipelines whicli'run from the Gulf of Mexico coast in Texas and Louisiana through Arkansas, Mississippi, Alabama, Tennessee, Kentucky, Ohio, and Pennsylvania to deliver natural gas in West Virginia, New Jersey,' New York, and New England. The 11,900-mile long pipeline system is operated by the Tennessee Gas Pipeline Company.

. Mcf is a unit ,of measure in the oil and gas industry that denotes a thousand cubic feet of natural gas.

. Continuous gas lift is a process of lifting fluids from a well by the continuous injection of high-pressure gas to supplement the reservoir energy. • As the name implies, with intermittent gas lift, the reservoir fluid is produced intermittently by displacing liquid slugs with high-pressure injection gas.

. 1442 deposition of Palm, through its representative, Heaven Frilot. ,