Judge Roland L. Belsome
In this damages suit, the Plaintiff, Wade White, appeals the trial court's granting of summary judgment in favor of the Defendant, Cox Operating, LLC, on both the principal and reconventional demands. The trial court found that Cox's tortious infringement onto Mr. White's oyster lease was covered by a compromise agreement; therefore, it dismissed Mr. White's claims on the principal demand and awarded Cox indemnity and defense costs on its reconventional demand. For the reasons that follow, we reverse and remand.
FACTS AND PROCEDURAL HISTORY
The instant litigation was the subject of a previous appeal to this Court, wherein we summarized the factual and procedural background as follows:
Wade White, a lifetime oysterman, is the owner of multiple oyster leases. Cox Operating, LLC ("Cox") entered into a "Receipt and Release" for $ 100,000 with Mr. White in 2000, when Cox began drilling wells near some of his oyster leases.[1] Subsequently, Cox sought to drill more wells near Mr. White's leases. In 2012, Cox negotiated another drilling release [Letter Agreement] with Mr. White for $ 175,000.[2]
Around April 1, 2012, Mr. White discovered Cox's pilings driven into his oyster leases and water traffic that differed from the agreed upon routes on ingress/egress. Mr. White then contacted Cox, who allegedly admitted the error and promised payment for damages. Cox removed the pilings and then continued following the previous agreed upon ingress/egress routes. Cox later maintained that the executed drilling releases covered any damages caused by the pilings and extra water traffic.
Mr. White then filed a Petition for Damages against Cox due to the pilings. Cox filed a reconventional demand for breach of contract of settlement/compromise, declaratory judgment, and attorney's fees/costs. Cox also filed peremptory exceptions of res judicata and no right of action and sought expedited consideration from the trial court. The trial court heard oral argument, but did not accept *150 live testimony or evidence. After taking the matter under advisement, the trial court granted Cox's exception of res judicata and denied the exception of no right of action.
White v. Cox Operating, LLC , 16-0901, pp. 1-2 (La. App. 4 Cir. 4/5/17), 229 So.3d 534, 536.
In the prior appeal, this Court reversed the trial court's judgment granting the exception of res judicata and remanded the matter for an evidentiary hearing. On remand, Cox filed two motions for summary judgment, one on Mr. White's principal claims, and another on its reconventional demand. After a hearing, the trial court granted summary judgment in favor of Cox, dismissing Mr. White's lawsuit with prejudice and awarding Cox indemnity and defense on its breach of contract claim. The trial court deferred judgment on quantum and attorney's fees. This appeal followed.
STANDARD OF REVIEW
A motion for summary judgment is a procedural device used when there is no genuine issue of material fact for all or part of the relief prayed for by a litigant. It is reviewed on appeal de novo , with the appellate court using the same criteria that govern the trial court's determination of whether summary judgment is appropriate; i.e. , whether there is any genuine issue of material fact, and whether the movant is entitled to judgment as a matter of law. See , e.g. , Dunn v. City of Kenner , 15-1175, p.10 (La. 1/27/16), 187 So.3d 404, 412. In ruling on a motion for summary judgment, the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. All doubts should be resolved in the non-moving party's favor. Hines v. Garrett , 04-0806, p. 1 (La. 6/25/04), 876 So.2d 764, 765. A fact is material if it potentially ensures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of the legal dispute. A genuine issue is one as to which reasonable persons could disagree; if reasonable persons could reach only one conclusion, there is no need for a trial on that issue and summary judgment is appropriate. Id. at 765-66.
DISCUSSION
On appeal, Mr. White avers that the trial court erred in granting summary judgment on the principal and reconventional demands. The only issue before this Court is whether there are genuine issues of material fact that preclude judgment as a matter of law.
In its motion for summary judgment, Cox argued that the Letter Agreement clearly and unambiguously released Cox from any prospective damages to Mr. White's oyster beds arising from or related to drilling the additional wells. Cox further concluded that since the terms of the release were clear and unambiguous, extrinsic evidence cannot be used to determine the intent of the parties.
Cox's argument, however, ignores the jurisprudential exception to the extrinsic evidence rule, particularly as it pertains to compromise agreements. "A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship." La. C.C. art. 3071. The compromise instrument is governed by the same general rules of construction applicable to contracts. Brown v. Drillers, Inc. , 93-1019 (La. 1/14/94), 630 So.2d 741, 748. Therefore, in interpreting a contract, the analysis must start with the premise that legal agreements have the effect of law upon the parties and that the *151 courts are bound to give legal effect to all such contracts according to the true intent of the parties. Maggio v. Parker , 17-1112, p 4 (La. 6/27/18), 250 So.3d 874, 878-79 (citing Leenerts Farms, Inc. v. Rogers , 421 So.2d 216 (La. 1982) and Brown , 630 So.2d at 748 (a compromise "must be interpreted according to the parties' true intent.")). This principle is enshrined in the Civil Code, which states: "A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express." La. C.C. art. 3076.
Accordingly, when the words of the settlement agreement are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art 2046. However, Louisiana courts have crafted a jurisprudential exception to the extrinsic evidence rule for compromise agreements. When there is a dispute as to the scope of a compromise agreement, extrinsic evidence may be considered to decide what differences the parties intended to settle. Maggio , 17-1112, p. 4, 250 So.3d at 879 (citing Brown , 630 So.2d at 749 ). The Louisiana Supreme Court has long held that a general release will not necessarily bar claims that were not intended by the parties to be covered by the release. See id. Intent is determined by construing the compromise instrument "in light of the surrounding circumstances at the time of execution of the agreement." Id. , 17-1112, p. 5, 250 So.3d at 879 (quoting Brown 630 So.2d at 748-49 ). The parties to a release instrument are therefore "permitted to raise a factual issue as to whether unequivocal language in the instrument was intended to be unequivocal." Id.
In interpreting this jurisprudential rule, courts have cautioned that, absent some substantiating evidence of mistaken intent, no reason exists to look beyond the four corners of the instrument to ascertain intent. Id. Therefore, utilizing a case-by-case analysis, Louisiana courts have limited the application of the extrinsic evidence exception to cases in which substantiating evidence is presented establishing either (1) that the releasor was mistaken as to what he or she was signing, even though fraud was not present; or (2) that the releasor did not fully understand the nature of the rights being released or that the releasor did not intend to release certain aspects of his or her claim. Id. When the factual circumstances surrounding the execution of the release instrument do not fall within either of the above categories, Louisiana courts have applied the general rule of construction in La. C.C. art. 2046 and have not hesitated to confine their analysis to the four corners of the instrument. Id.
When determining whether the jurisprudential exception to the extrinsic evidence rule applied, the Maggio Court considered three factors: 1) the terms of the release, 2) the nature of the substantiating evidence presented, and 3) circumstances surrounding the signing of the release. Maggio , 17-1112, p. 5, 250 So.3d at 879. First, we must consider whether the terms of the Letter Agreement clearly and unambiguously released Cox from liability as it relates to driving pilings and navigating support vessels through Mr. White's oyster lease.
In its reasons for judgment, the trial court ruled in favor of Cox agreeing that the terms of the Letter Agreement (release) clearly and explicitly covered the claims set forth in Mr. White's lawsuit.[3]
*152 Significantly, it held that the Letter Agreement did not modify or incorporate all of the terms of the Receipt and Release, and did not contain terms regarding routes of ingress and egress. We disagree.
Although the Letter Agreement contains a general release, there are additional terms that reflect the Receipt and Release was included as part of the Letter Agreement. The subject line of the Letter Agreement states:
Re: Oyster Lease Nos. 30566 and 31050 (collectively, the "Oyster Leases") State of Louisiana Mineral Lease No. 16158 (the "Mineral Lease") Receipt and Release executed by the parties hereto on November 8, 2000 (the "Receipt and Release")
In addition, the Letter Agreement contains the following language:
As you are aware Louisiana Bay Drilling, L.L.C. ("LBD"), through its operator Cox Operating, L.L.C. ("CO"), is engaged in drilling operations on lands covered by the Mineral Lease, including drilling and completion of S.L. 16158 No.1 Well ("Well No. 1") in 2001. LBD expects to commence drilling of a second oil, gas and mineral well ("Well No. 2) pursuant to the Mineral Lease in 2012, and LBD may drill a third and fourth oil, gas and mineral well on lands covered by the Mineral Lease in 2013 and/or 2014 (each, an "Additional Well") following completion of Well No. 2 (Well No. 1, "Well No. 2 and any Additional Wells are referred to collectively as the "Wells").
***
By your acceptance of the Offer and your execution and delivery of this letter agreement, you (i) accept the Offer contained in this letter agreement as full and complete compensation for any and all existing and future Claims (as defined in the Receipt and Release) arising out of or relating to any Well and/or Operations (as defined herein) pertaining to any Well; (ii) represent and warrant to LBD your sole ownership of the Oyster Leases; (iii) agree that execution and delivery of this letter agreement does not prejudice any rights, claims or defenses of any of the Released Parties under the Receipt and Release; and (iv) agree not to sue or make any claim against any LBD/CO Party (as defined herein) for any matter directly or indirectly arising out of, in connection with or in any way related to Operations relating to any Well or any other matter or conduct whatsoever (whether action or inaction) of any LBD/CO Party involving Operations relating to any Well.
***
... As used herein, "Operations" means any and all activities by or on behalf of any LBD/CO Party that relate in any way to any Well (or the minerals produced therefrom), including; without limitation: drilling, completing, recompleting, reworking, sidetracking, deepening, dredging, propwashing, equipping, installing, maintaining or removing of pipelines or other facilities, servicing, producing, plugging and abandonment activities, remediation of any kind, gathering, transportation, treating, processing, compression and marketing of oil, gas or other minerals.
... The parties hereto agree to cooperate fully and execute any and all supplementary documents and to take all additional actions which may be necessary or appropriate to give full force and effect to the terms and intent of this letter agreement. Together with the Receipt and Release, this letter agreement contains the entire understanding of the parties relating to the subject matter contained herein and supersedes *153 all prior agreements and understandings, written or oral, relating to the subject matter hereof; provided, however, that the Receipt and Release shall remain in full force and effect (emphasis supplied). ...
When viewing the Letter Agreement as a whole, we find that that the Letter Agreement is, at the very least, susceptible to another interpretation: the Receipt and Release was incorporated into the terms of the Letter Agreement. In particular, there is language that states that the Letter Agreement, "together with the receipt and release," contains the entire understanding of the parties. Moreover, the Letter Agreement specifically provides that the Receipt and Release remains in full force and effect.
Given this interpretation, the limitations on the route of ingress and egress, which were material to the Receipt and Release agreement, would also govern the Letter Agreement. In relation to the routes of ingress and egress, the Receipt and Release contains exhibits, which provide for the agreed upon routes. The Receipt and Release states the following:
A material consideration of this agreement without which the Releasing Parties would not have entered into this agreement is that the Released Parties agree to follow the route of ingress/egress as depicted on Exhibit "A" and place the proposed flowline/pipeline as depicted on the attached Exhibit "B" both of which are annexed hereto and considered part hereof and are further considered part of this release agreement. No substantial change in the route depicted on Exhibit "A" or the flowline/pipeline placement as to the water bottoms depicted on Exhibit "B" may be made without the express written consent of the Releasing Parties, which consent shall not be unreasonably withheld.
Attached as Exhibits "A" and "B" to the Receipt and Release is a map designating a "proposed rig route" and a proposed "flowline/pipeline." The contract does not contain a definition of these terms. Since words of art and technical terms must be given their technical meaning when the contract involves a technical matter, testimony is necessary to determine the intent of the parties concerning whether the Letter Agreement limited Cox to the same rig routes of ingress and egress set forth in the Receipt and Release and as to the meaning of "rig route." See La. C.C. art. 2047 ; Red Willow Offshore, LLC v. Palm Energy Offshore LLC , 15-0512, pp. 6-7 (La. App. 4 Cir. 2/3/16), 185 So.3d 293, 297-98. Since both the Letter Agreement and the Receipt and Release require additional evidence for interpretation purposes, we cannot say that Mr. White clearly and unambiguously released Cox from liability as it relates to driving pilings and navigating support vessels through Mr. White's oyster lease.
Next, even assuming that the terms of the Letter Agreement were clear, Mr. White has provided sufficient evidence to establish that he did not intend to release Cox from the claims asserted in his lawsuit. Attached to his motion for summary judgment is his affidavit, which specifically states that he did not intend to release Cox from damages associated with pile driving and vessel traffic directly on his oyster lease. In support, he noted that the Letter Agreement included the drilling of three additional wells, Well Nos. 2, 3, and 4. Well No. 2 was drilled without incident, in keeping with the prior routes of ingress and egress used for Well No. 1.
Mr. White also stated that when he noticed the pilings and vessels on his lease, he immediately called Cox, who apologized for the mistake and assured that the issue would be resolved. Cox additionally offered *154 him $ 25,000.00 for the damage. To substantiate this statement, Mr. White submitted a letter and deposition of Rodney Dykes, an employee of Cox. In the letter, Mr. Dykes offered a monetary settlement, agreeing that the pile driving activities and vessel traffic on Mr. White's oyster lease were outside of their agreement.[4] In his deposition, Mr. Dykes testified that the activities were a mistake, which deviated from the drilling plan. Further, Mr. White submitted maps that show the vessels while moored to the pilings on his leasehold and a map showing the subsequent removal of the vessel traffic from his leasehold.
Finally, the circumstances surrounding the signing of the agreement also give rise to an issue of fact concerning the scope of the Letter Agreement. In particular, Mr. White's affidavit and supporting documentation suggest that the parties intended to use the same routes of ingress and egress that were used for Well Nos. 1 and 2. Mr. White's affidavit and attachments specify that at the time of signing the agreement, Mr. White was provided with permit applications Cox submitted to the Louisiana Wildlife and Fisheries, along with reports that indicated the same access routes that were previously used would be utilized again.
Given the foregoing circumstances, Mr. White has provided sufficient evidence to support the conclusion that he did not intend to release Cox from the activities set forth in his lawsuit, thus triggering the exception to the extrinsic evidence rule.
Accordingly, we find there are genuine issues of material fact regarding the interpretation of the release and the intent of the parties sufficient to defeat summary judgment on Mr. White's principal demand.[5] In light of this finding, the trial court's summary judgment on the reconventional demand is premature.
CONCLUSION
For the reasons assigned, the trial court's summary judgment on both the principal and reconventional demand is reversed. The matter is remanded for further proceedings consistent with this opinion.
REVERSED AND REMANDED

Cox's predecessor-in-interest, Cliffwood Production Co., was party to the 2000, Receipt and Release agreement.

Cox drilled a second well without incident. The issue in this case concerns the drilling of Well Nos. 3 and 4.

The trial court stated that the Letter Agreement covered: "any and all existing and future Claims (as defined in the Receipt and Rel[e]ase) arising out of or relating to any Well and/or Operations (as defined [in the Letter Agreement] ) pertaining to any Well[.]"

Tellingly, the letter distinguishes damages associated with propwashing operations as being covered by the Letter Agreement.

As such, we pretermit discussion of the other issues briefed by the parties.